UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF MICHIGAN

JAC HOLDING ENTERPRISES, INC.,
WYNNCHURCH CAPITAL, LTD., and
WYNNCHURCH CAPITAL PARTNERS II, L.P.,

        Plaintiffs,                Hon.

vs.                              Case No. -- cv --

ATRIUM CAPITAL PARTNERS, LLC, ANNEX
CAPITAL MANAGEMENT, LLC, DANIEL J.
SMOKE, ALEXANDER P. COLEMAN, individually      DEMAND FOR JURY TRIAL
and as Trustee of the ALEXANDER P. COLEMAN
2010 GRANTOR RETAINED ANNUITY TRUST
U/A DATED NOVEMBER 23, 2010, ROBERT E.
FOWLER, III, DALE L. CHENEY, AMANT
DEWAN, STEPHEN MORREY, and SERGEY
AGAFONKIN,

        Defendants.

---

## COMPLAINT

Plaintiffs JAC Holding Enterprises, Inc. ("Enterprises"), Wynnchurch Capital, Ltd., and

Wynnchurch Capital Partners II, L.P. (together with Wynnchurch Capital, Ltd., "Wynnchurch,"

and collectively with all plaintiffs, the "Buyers"), as their Complaint against the defendants

named in the caption above, allege as follows:

### INTRODUCTION

1.      This case arises from a massive fraud prior to, and in connection with,

Defendants' sale of JAC Holding Corporation ("JAC") to the Buyers on December 20, 2010.

After extensive due diligence, the Buyers paid approximately $87 million for JAC pursuant to an

Agreement and Plan of Merger ("Agreement," attached as Exhibit A).  But during that due

diligence, certain Defendants – including JAC's former controlling stockholders, managers and

executives – conspired to knowingly, intentionally, and recklessly make fraudulent

representations and statements and conceal material information for the purpose of inflating

JAC's apparent value.  Those Defendants engaged in this behavior pursuant to a carefully

orchestrated scheme to induce the Buyers to vastly overpay for JAC.  This scheme is evident

from a litany of internal documents prepared in connection with the fraud, which were recovered

following one of the Defendants' attempts to destroy these documents and bury the evidence of

the conspiracy to commit fraud.  The Buyers discovered the massive fraud shortly after the

acquisition.  As the fraud has been unwound, it has become clear that the Buyers' damages

approach $50 million.

## PARTIES, JURISDICTION, AND VENUE

2.      JAC Holding Enterprises, Inc. is a Delaware corporation with its principal place

of business in Pontiac, Michigan in the county of Oakland.

3.      Wynnchurch Capital, Ltd. is a Delaware corporation with its principal place of

business in Rosemont, Illinois in the county of Cook.  Wynnchurch Capital, Ltd. makes

investment and management decisions on behalf of Wynnchurch Capital Partners II, L.P.

Wynnchurch Capital, Ltd. also provides financial and management consulting services to an

operating subsidiary of Enterprises.

4.      Wynnchurch Capital Partners II, L.P. is a Cayman Islands exempted limited

partnership with its principal place of business in Rosemont, Illinois in the county of Cook.

Wynnchurch Capital Partners II, L.P. is the majority shareholder of Enterprises, which was

incorporated for the purpose of owning JAC pursuant to the Agreement.  Defendants knew that

Wynnchurch Capital, Ltd. was acting in part on Enterprises' and Wynnchurch Capital Partners

II, L.P.'s behalf during due diligence for the sale of JAC.

5.      Atrium Capital Partners, LLC ("Atrium") is a Delaware limited liability company

with, upon information and belief, its principal place of business in Palm Beach, Florida in the

county of Palm Beach.  It was previously known as Annex Holdings IV LLC until its corporate

name was amended on May 25, 2010.  Atrium was JAC's controlling shareholder at the time the

transaction at issue closed and is a party to the Agreement.  Pursuant to the Agreement, Atrium

also serves as the Company Stockholders' Representative to act on behalf of the former

stockholders of JAC and fulfill those stockholders' indemnification obligations under the

Agreement.

6.      Annex Capital Management, LLC ("Annex Capital") is a Delaware limited

liability company with its principal place of business in New York, New York in the county of

New York.  Annex Capital was paid a "Closing Fee" of nearly $1.67 million when JAC was

sold.  Annex Capital was the Manager of Atrium at the time of the closing and signed the

Agreement on Atrium's behalf.  Upon information and belief, Annex Capital wholly controlled

Atrium and controlled JAC through Atrium.  Annex Capital and Atrium are hereafter collectively

referred to as "Annex."

7.      Daniel J. Smoke is an individual who, upon information and belief, resides in Ann

Arbor, Michigan in the county of Washtenaw.  Smoke was the Chief Financial Officer of JAC

until he was terminated for cause on December 21, 2010.  During his time at JAC, Smoke lived

in Michigan and worked in JAC's offices in Saline, Michigan in the county of Washtenaw and

Pontiac, Michigan in the county of Oakland.  Upon information and belief, Smoke acted as an

agent of Annex during all relevant periods.

8.      Alexander P. Coleman is an individual who, upon information and belief, resides

in Locust Valley, New York in the county of Nassau, and Palm Beach, Florida in the county of

Palm Beach.  Coleman is a Managing Partner of Annex and was Annex's agent during all

relevant periods.  Coleman traveled to Pontiac, Michigan in the county of Oakland to attend

board meetings for JAC, and he was involved in JAC's management with the knowledge and

intent that his actions would affect JAC's operations in Michigan. Coleman is the former Chairman of the Board of JAC. In January 2009, he entered into a Compensation Agreement with JAC, in which he was paid a percentage of JAC's earnings each year through quarterly retainers. Coleman assigned his responsibilities under that agreement to Annex in December 2010. Coleman is also the Trustee of the Alexander P. Coleman 2010 Grantor Retained Annuity Trust U/A Dated November 23, 2010 ("Trust"), which was one of JAC's major stockholders at the time of closing and is a party to the Agreement. Coleman signed the Agreement on behalf of JAC, Annex, and Trust.

9.      Robert E. Fowler, III is an individual who, upon information and belief, resides in West Hartford, Connecticut in the county of Hartford. Fowler is a Managing Partner of Annex and was Annex's agent during all relevant periods. Fowler was also a director of JAC. Fowler traveled to Pontiac, Michigan in the county of Oakland to attend board meetings for JAC. He directed JAC's management with the knowledge and intent that his actions would control JAC's operations in Michigan. Fowler owned significant stock options in JAC and was paid over $729,000 for his stock options when JAC was sold.

10.     Dale L. Cheney is an individual who, upon information and belief, resides in Darien, Connecticut in the county of Fairfield. Cheney was a Principal and agent of Annex during all relevant periods. Prior to the sale of JAC to the Buyers, Cheney was paid by JAC's subsidiary, JAC Products, Inc., as an independent consultant pursuant to a Consulting Agreement. Cheney was paid a "transaction bonus" of $1.45 million for the sale of JAC. Upon information and belief, Cheney regularly visited JAC's offices in Saline, Michigan in the county of Washtenaw and Pontiac, Michigan in the county of Oakland, to conduct business on behalf of Annex and control JAC's operations.

11.     Amant J. Dewan is an individual who, upon information and belief, resides in New York, New York in the county of New York.  Dewan is a Principal of Annex.  Dewan was one of JAC's major stockholders at the time of closing and is a party to the Agreement in his personal capacity.

12.     Stephen Morrey is an individual who, upon information and belief, resides in Oxford, Michigan in the county of Oakland.  Morrey is a current or former Operating Partner of Annex, and he was the CEO and President of JAC Products until January 2011.  During his time at JAC, Morrey lived in Michigan and worked in JAC's offices in Saline, Michigan in the county of Washtenaw and Pontiac, Michigan in the county of Oakland.  Morrey acted as an agent of Annex prior to the sale of JAC to the Buyers.

13.     Sergey Agafonkin is an individual who, upon information and belief, resides in Chicago, Illinois in the county of Cook.  Agafonkin was an employee or consultant at JAC prior to the sale of JAC to the Buyers.  During his time at JAC, Agafonkin lived in Michigan and worked in JAC's offices in Saline, Michigan in the county of Washtenaw and Pontiac, Michigan in the county of Oakland.  Agafonkin acted as an agent of Annex during all relevant periods.  In 2010, Annex approved the grant of thousands of stock options in JAC to Agafonkin to thank him for his service and give him an even greater incentive to fraudulently inflate JAC's value in order to make sure it sold at the highest possible price.

14.     Original jurisdiction is proper in this Court under 28 U.S.C. § 1331 because certain of the claims asserted in this Complaint arise under the laws of the United States.  This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. § 1367 because they form part of the same case and controversy as the matters arising under the Court's original jurisdiction.

15.     Venue is proper in the Eastern District of Michigan under 28 U.S.C. § 1391(a)(2) because a substantial part of the events and omissions giving rise to the claims occurred here. JAC's principal places of business are in Saline and Pontiac, Michigan, and the majority of the events at issue – including many of Defendants' fraudulent acts and contract breaches – took place in or utilized JAC's Michigan offices.

16.     Venue is also proper in this Court, and the Court may exercise personal jurisdiction over the parties to the Agreement, because Section 8.10 of the Agreement provides that the parties shall submit to this Court's jurisdiction and bring all claims arising out of the transaction at issue in the courts of the Eastern District of Michigan:

> The parties agree that all disputes relating to or arising under this Agreement shall be brought exclusively in the State or Federal courts located in the Eastern District of Michigan and each of the parties (a) consents to submit itself to the personal jurisdiction of such courts, in connection with any dispute that arises out of or relates to this Agreement, (b) agrees that will not attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court, and (c) agrees that it will not bring any action arising out of or relating to this Agreement in any court other than such courts.

17.     In addition, this Court also has personal jurisdiction over all Defendants because, among other things, they (a) conducted business in Michigan; (b) purposefully availed themselves of the State of Michigan by owning a company that does most of its business here and then selling that company by way of fraudulent inducement; and (c) the transaction out of which the causes of action arise was the result of due diligence performed primarily in Michigan, for a company that conducts most of its business in Michigan, and which closed at the offices of Honigman Miller Schwartz and Cohn LLP in Detroit, Michigan.

**THE CONSPIRACY**

18.     Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin (hereinafter, the "Conspirators") were stockholders of JAC, members of Annex, and/or Annex's

6

agents operating within JAC.  Each of the Conspirators stood to personally profit from the sale of JAC.  Indeed, the higher JAC's sale price, the more profit they stood to gain.  In the summer and fall of 2010, motivated by a desire to inflate JAC's apparent value and boost their personal profit from the sale transaction, the Conspirators created and carried out a scheme to manipulate JAC's financial statements in order to conceal negative financial information and falsify JAC's earnings.  These efforts were designed to give the Buyers the false but reasonable impression that JAC was worth far more than it was and deceive the Buyers into overpaying for JAC.

19.     JAC is an automotive supply manufacturer that produces roof rack systems and side rails for use by auto manufacturers.  Annex had purchased JAC from CVC Capital Partners in 2009.  At that time, Coleman had been a Director of CVC and controlled Annex.  Cheney was a Vice President at CVC.  The sale of JAC to Annex was part of a severance arrangement between Coleman and CVC, and Annex became JAC's majority shareholder.  Defendant Dewan, who was also a Principal of Annex, also became a major stockholder of JAC and further strengthened Annex's control over JAC's operations.

20.     Annex's majority ownership of JAC gave the Annex principals Coleman, Fowler, Dewan, and Cheney total control of JAC, and they did not hesitate to exercise that power over every facet of JAC's operations.  For example, Coleman appointed himself Chairman of JAC's Board of Directors and signed a management agreement with JAC giving him the means to control the company, which he then assigned to Annex.  Fowler was similarly appointed as a Director of JAC.  And Cheney arranged for JAC to hire him as a "consultant," whereby JAC's profits were used to compensate him for providing management services.  Annex also installed Morrey as JAC's CEO and Smoke as its CFO, to act as Annex's agents to artificially enhance JAC's appearance of profitability by any and all means.

21.     Coleman, Cheney, and Fowler undertook the unlawful acts described herein both on their own behalf and in the scope of their employment and to further the interests of Annex.

22.     Annex owned JAC for only a brief period before Coleman, Cheney, Fowler, and the other shareholders began to implement plans to sell the company.  The Conspirators were focused on closing the deal before the end of 2010 so they could pocket more of the proceeds.  At the time, they believed that the rate on capital-gains taxes would spike in 2011 and potentially cost them millions of dollars if their gains from JAC's sale were realized under anticipated higher tax rates.  Thus, the Conspirators were motivated to find a buyer for JAC quickly, sell JAC for a high price, and do whatever it took to close the deal before the end of the year.  Moreover, unless the transaction closed quickly, much of the Conspirators' complex manipulation of JAC's books and records to boost the appearance of profitability would have unraveled as JAC would have run out of cash and available borrowings.

23.     In July 2010, the Conspirators began to solicit bids for JAC on the private equity market.  JAC was advertised as the leading global supplier of roof rack systems to automotive original equipment manufacturers with top market share in both North America and Europe.  They marketed JAC as a company with solid financial fundamentals that was well positioned to succeed as the automotive sector rebounded.  The Conspirators presented data that showed JAC as a company with increasing earnings and strengthening financials through the first half of 2010, with a financial base that would allow this strong performance to continue.

24.     Wynnchurch is a private equity firm focused on middle-market companies in North America.  The Conspirators, with the assistance of their investment bank, William Blair & Company, provided Wynnchurch with materials in July 2010 in an effort to convince Wynnchurch to enter into the sale process.  For example, the Conspirators provided Wynnchurch with JAC's financials, which purported to show a company with strong profits and a low cost

8

structure in the early part of 2010 coming off the worldwide economic downturn.  Based on these financial representations, the Buyers continued their negotiations with the Conspirators.

25.     Throughout the negotiation process, the Conspirators went to great lengths to provide financial information that painted JAC as a healthy company with reliable and promising financial performance.  Unbeknown to the Buyers, however, from the start of the sale process and resulting negotiations, the Conspirators had already been cooking JAC's books.  In fact, concurrent with the launch of the potential sale in July 2010, the Conspirators had settled on a scheme to manipulate and misrepresent financial data in a manner that would falsify JAC's earnings and correspondingly mislead the potential Buyers into paying far more for JAC than the company was worth.

26.     In July 2010, Conspirators Coleman, Cheney, and Fowler agreed and conspired to manipulate and falsify JAC's financial data.  Pursuant to that agreement, they enlisted the cooperation of Morrey and Smoke, who were well positioned to take steps to implement the Conspirators' fraud.  Defendants Morrey, Smoke, and Cheney had brought in Agafonkin to prepare financial models for JAC's sale, and Agafonkin was recruited into the scheme as well.  An explicit goal of the scheme and directive from the Conspirators was the outright falsification of JAC's financials.

27.     As part of this conspiracy, Coleman, Cheney, and Fowler expressly instructed Morrey, Smoke, and Agafonkin to come up with a "plan" to falsify and manipulate JAC's financials in order to boost JAC's earnings and inflate its potential sale value.  Smoke, Morrey, and Agafonkin executed their marching orders and began to implement the campaign to manipulate JAC's financials.  The Conspirators controlled the flow of information with a tight rein, funneling as much information as possible through only Smoke, Morrey, and Agafonkin, and carefully monitoring the information that went to the Buyers.

9

28.     The Conspirators' scheme was wide-ranging.  As discussed in more detail below, the Conspirators engaged in numerous acts to hide and fraudulently manipulate negative data on JAC's financial statements.  The conspiracy operated at the direction and control of Coleman, Fowler, and Cheney, who controlled JAC through Coleman's and Annex's ownership control and management agreements.  Morrey, Smoke, and Agafonkin implemented many aspects of the scheme on behalf of all of the Conspirators, but they sought advice, authority, and approval from Coleman, Fowler, and Cheney to engage in each of the specific fraudulent acts that advanced the conspiracy.

29.     A key part of the Conspirators' scheme was to maintain two separate budgets. One budget was JAC's internal, "real" budget; it more accurately reflected JAC's financial state and was used internally to monitor JAC's actual financial performance.  During due diligence, the Buyers specifically asked to see all versions of this internal budget.  But the Conspirators never provided this budget to the Buyers.  Instead, they provided a separate budget prepared by Agafonkin under the close direction and control of Cheney and the other Conspirators. Agafonkin's budget was, in short, a fake; it ignored operational expenses and costs to create more favorable numbers, and it only tracked the real budget when doing so would show gains to JAC's earnings.  Indeed, on September 29, 2010, Cheney told Agafonkin, Smoke, and Morrey that they needed to show better cash flow for JAC.  Cheney then instructed Agafonkin to change the fake budget's model to show increasing cash flow year-over-year, without regard for JAC's actual performance.  The Conspirators knew Agafonkin's budget was divorced from reality and not what the Buyers had requested; in fact, it was created to mislead the Buyers during due diligence.  For example, Agafonkin e-mailed other members of the Conspiracy to discuss the fact that JAC was providing a budget to the Buyers (his budget) that did not reflect the fact that JAC would not hit its financial targets.  Nevertheless, throughout due diligence, including on or about

10

November 4, 2010, in a file uploaded to the electronic "dataroom" of documents used for due diligence, the Conspirators provided Agafonkin's phony budget to the Buyers in response to the Buyers' requests for JAC's internal budgets, fraudulently representing Agafonkin's as the one and only budget JAC maintained.

30.     Other elements of the scheme relied on knowing and purposeful falsification of JAC's financial statements.  As an express part of the conspiracy, the Conspirators agreed to hide expenses, manipulate reserves, stretch payables, and a host of other artifices that would help them achieve their expressly stated goal of "manufacturing" earnings and falsifying JAC's historical financial statements.  The Conspirators intended for the falsified historical financials to be used as a bridge to determine JAC's value.  Thus, the Conspirators planned to inflate JAC's apparent value and, correspondingly, its sale price and the profit to the Conspirators.

31.     The Buyers reviewed and relied upon this falsified financial information throughout the negotiations and closing of the transaction.  The Conspirators confirmed and endorsed this false information during presentations by JAC management to the Buyers.  All of the information that was provided to the Buyers was provided by the Conspirators or filtered through the Conspirators.

32.     Based on this false financial data, the Buyers and the Conspirators negotiated the terms of a Letter of Intent, which was signed in early October 2010.  Following the execution of the Letter of Intent, the Buyers entered into full-scale due diligence.  As part of that due diligence, the Buyers repeatedly asked for full and complete financial statements for JAC, including updates to any financials as the updates became available.  During this due diligence, the Conspirators' fraud accelerated.

33.     Almost immediately after the parties signed the Letter of Intent in early October 2010, JAC's actual financial results declined more significantly and bore no resemblance to the

1411476

picture of financial health painted by the Conspirators in JAC's phony budget and financial statements.  In particular, the financial performance of JAC's European subsidiary worsened quickly and severely in the fall.  The Buyers were insisting that the Conspirators provide financial statements that would be incorporated into the representations and warranties in final sale documents.  The Conspirators knew that if they disclosed the true and accurate financial information to the Buyers, it would have been apparent that JAC was losing its value and the Buyers would insist on a lower price or back out of the deal entirely.  The Conspirators were bent on reaping a profit from the sale of JAC, and they were running out of time to do so before 2011 came, when anticipated higher taxes would eat into their gain and their fraud would have been exposed through JAC's lack of funding.

34.     The Conspirators' solution to their problem was to escalate the fraudulent scheme they started in the summer and further manipulate and falsify JAC's financial statements.  The Conspirators carried out this part of their scheme in two steps.  ***First***, they fraudulently manipulated and omitted negative financial data that should be have been reflected in the consolidated financial statements and other due diligence materials provided to the Buyers.  Smoke took the laboring oar in carrying out this part of the scheme at the direction of the other Conspirators.

35.     For example, Smoke, at the instruction of and with the knowledge of the other Conspirators, instructed employees at JAC in an August 27, 2010 e-mail message to "manufacture" earnings when he saw that JAC's actual performance was coming in far lower than the Conspirators needed to get their desired price for JAC.  By "manufacture," Smoke meant that he wanted – pursuant to the Conspirators' plan – JAC's employees to manipulate the company's financials to mask and conceal JAC's true financial condition.  Smoke, under the

12

direction of and with the knowledge of the other Conspirators, also directed JAC employees to ignore negative financial information and withhold it from JAC's financial statements.

36.     Pursuant to the Conspirators' scheme, Morrey also attempted to enlist third parties in the fraud.  Prior to and during the sales process, The Stewart Company served as JAC's outside sales representative for certain customers.  Morrey instructed Don Muñoz, JAC's Vice President of Sales, to approach The Stewart Company to try to engage its participation in a scheme to manipulate JAC's sales data.  Specifically, Morrey's plan was to move sales that, pursuant to contracts with JAC's customers, were scheduled to be recognized in 2011 into earlier periods in 2010.  This would falsely inflate JAC's apparent value by creating false and misleading 2010 sales results.

37.     In addition to falsifying data, the Conspirators made the deliberate and explicit decision to delay financial reporting of negative issues in order to mask JAC's worsening financial condition.  For example, in early October 2010, when JAC's September results came in well below JAC's internal budget and the October results appeared likely to be even worse, the Conspirators discussed options for removing the negative data from the September balance sheet to conceal it from the Buyers.  Pursuant to the Conspirators' plan, Smoke instructed Agafonkin on October 6, 2010, to delay financial reporting and conceal negative developments that would impact financial statements to further the plan to fraudulently manipulate JAC's results.

38.     The Conspirators continued this part of their scheme through closing.  Cheney, on behalf of and with the knowledge of the other Conspirators, ordered Agafonkin in November 2010 to temporarily withhold the consolidated October 2010 financials from the Buyers, so that the Conspirators had additional time to manipulate the financials and hide the worsening earnings situation at JAC and its European subsidiary.  The Conspirators' manipulated and falsified October 2010 financials were completed on November 22, 2010.  That day, the Buyers

received the fraudulent October 2010 financials from the Conspirators in an e-mail message from the Conspirators' investment bank, William Blair.  William Blair had received the October 2010 financials earlier that day from Agafonkin, Cheney, Morrey, and Smoke.  The Conspirators intentionally misrepresented the October 2010 financials as complete, accurate, and in full compliance with GAAP.  Thus, the Buyers had no way of knowing that by October, JAC's financial performance was quickly deteriorating.

39.     **Second**, having carefully manipulated JAC's October financials to line up with their phony budget, the Conspirators decided to simply lie about the November 2010 financials and fraudulently withhold them prior to closing on December 20, 2010.

40.     The November 2010 financial results from JAC's European operations showed a dramatic, material adverse change in JAC's overall financial condition.  To hide this material adverse change, the Conspirators told the Buyers the full European financials for November 2010 were not available prior to closing.  This was a carefully coordinated lie in furtherance of the Conspirators' overarching scheme.

41.     December 14 through 16, 2010, Smoke sought Annex's authority to withhold the November 2010 European financial results because the results had come in hundreds of thousands of Euros below their forecasts.  Conspirators Coleman, Fowler, and Cheney instructed Smoke to withhold them.  As the Conspirators reasoned, if they gave the European numbers to the Buyers, they risked the Buyers learning that JAC's earnings were nose-diving.  The Conspirators agreed this was unacceptable because the Buyers would reduce their price or walk away from the deal entirely.

42.     The Conspirators also agreed to lie to prevent the Buyers from receiving the November financials.  Smoke asked Annex via e-mail messages on December 16, 2010 for approval for the Conspirators to lie to the Buyers and tell them a concocted story that the full

14

profit and loss statement ("P&L") for Europe was not available because key European executives were on vacation.

43.     Shockingly, the other Conspirators approved the plan.  Indeed, Fowler affirmatively wrote to other Conspirators that they should go with Smoke's fraudulent story about the European executives being on vacation.  Fowler also instructed Morrey and Smoke to conceal from the Buyers that *any* final numbers regarding JAC's November 2010 performance in Europe were available, because it might lead the Buyers to ask why the "full package" of European financials was not available.

44.     On December 16, 2010, after the Conspirators settled on this part of their scheme, Cheney, on behalf of and with the knowledge of the other Conspirators, fraudulently represented to the Buyers via an e-mail message that the November 2010 P&L for Europe was not yet available because the top two European executives were on vacation.  Fowler, on behalf of and with the knowledge of the other Conspirators, similarly misrepresented to the Buyers via an e-mail message that the November 2010 European P&L was not yet available.  And Smoke, on behalf of and with the knowledge of the other Conspirators, made similar representations to the Buyers the next day and throughout the rest of the negotiations.

45.     The Conspirators took steps to make sure that JAC's European subsidiary followed the lie.  On December 19, 2010, Morrey e-mailed Harriet Pesch – one of the European executives who, according to the fraudulent story the Conspirators were telling the Buyers, was not available – and instructed her to only provide data regarding Europe's November 2010 financial situation to Smoke.  The Conspirators did this with the intent to keep the Buyers from seeing that data.

*       *       *       *       *

1411476

46.     The Conspirators had a duty to respond to the Buyers' due diligence requests with full and accurate information, but instead they intentionally concealed the true state of JAC's finances and misrepresented the data upon which the Buyers reasonably relied.  The purpose of the Conspirators' overarching scheme was to induce the Buyers into paying far more than JAC was worth.  That scheme was successful.  The Buyers' offer price for JAC was based on the grossly inaccurate financial information the Conspirators provided during due diligence and, as a result, the Buyers were damaged when they overpaid for JAC.

47.     To further induce the Buyers to enter into the deal, the Conspirators agreed to include numerous representations and warranties in the Agreement regarding JAC's financial statements, operations, inventory, and overall financial health.  Several members of the conspiracy, including Annex, Coleman (individually and on behalf of Trust), and Dewan signed the Agreement containing the representations and warranties.  These representations and warranties were knowingly false and essentially amounted to another tool for the Conspirators to use to further their fraudulent scheme.

48.     But these representations and warranties were not only tools of the Conspirators' fraudulent scheme – they were frauds in their own right, because they were false, and Conspirators made them knowingly and intentionally false from the start.  For example, under Section 2.7 of the Agreement, JAC's financial statements – including the consolidated balance sheet of JAC as of October 31, 2010 that the Conspirators had fraudulently manipulated – were to "have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved," and were to "fairly present, in all material respects," JAC's financial position as of closing.  Further, JAC's "books, records and accounts" were represented to be "accurate and complete in all material respects in accordance with good business practice and applicable Laws."  And under Section 2.8 of the Agreement, JAC was represented to have conducted its

16

business "only in the ordinary course consistent with past practices," with no "Material Adverse Change to the Company."

49.     Even before closing, the Conspirators knew that these and many other representations and warranties in the Agreement were false.  The Conspirators' intentional acts to move or omit much of the negative financial data from the October 2010 financials, described in further detail below, show that they knew the financial statements they provided to the Buyers were neither "prepared in accordance with GAAP" nor "accurate and complete in all material respects."  And the Conspirators intentionally designed their blatant lies concerning the availability of the November 2010 P&L for Europe to prevent the Buyers from learning of the material adverse changes that had occurred at JAC's European operations and throughout the company prior to closing.  Thus, many of the representations and warranties in the Agreement were intentionally fraudulent from the moment they were written down, and the Conspirators used them as part of their fraudulent scheme to induce the Buyers to purchase JAC for far more than it was worth.

50.     Relying on the Conspirators' fraudulent misrepresentations, the Buyers entered into the Agreement and paid approximately $87 million for JAC.  Plaintiff Wynnchurch established Plaintiff Enterprises shortly before closing for the express purpose of purchasing JAC, which the Conspirators fully understood.  Pursuant to the Agreement, Enterprises purchased all of JAC's outstanding capital stock, including the securities owned by the Conspirators and Defendant Trust.

### ADDITIONAL, SPECIFIC FRAUDS AND BREACHES OF THE AGREEMENT UNDERTAKEN AS PART OF THE CONSPIRACY

51.     After closing, the Buyers were able to access information about JAC that they had not been able to uncover during due diligence, in part due to the Conspirators intentionally hiding, manipulating, and omitting key data.

17

52.     Within days of closing, as part of their standard practice, the Buyers began to perform additional reviews of the operations, financial statements and other documents, accounting methodologies, and other books and records of JAC that they were unable to access prior to closing.  That review led the Buyers to uncover the Conspirators' frauds and breaches of the Agreement.

53.     One of the most blatant indications of the Conspirators' overarching scheme that the Buyers found is an effort Smoke made to conceal what the Conspirators had done by deleting incriminating e-mails.  Smoke was released from JAC almost immediately after closing.  The Buyers discovered that before leaving, Smoke attempted to permanently delete incriminating e-mail messages – including thousands of e-mails with his co-Conspirators Coleman, Fowler, Cheney, Morrey, and Agafonkin – from his work computer and JAC's e-mail server.  There is no doubt Smoke deleted these e-mails in a knowing and intentional effort to prevent the Buyers from seeing his communications with the other Conspirators.  Indeed, Smoke did not merely move the e-mails to his "Trash," or "Deleted Items" folder; instead, he double-deleted the files so they could not be easily restored.  The Buyers have devoted significant technical and forensic expertise to recover the e-mails that Smoke deleted, and some e-mails, including e-mails showing the Conspirators' scheme, have been recovered.  But many e-mails are unrecoverable or only partially recoverable.  Therefore, due to the Conspirators' attempts to hide their tracks by destroying evidence of their communications, the full extent of the Conspirators' fraud is not yet knowable.  Yet the evidence uncovered so far demonstrates the Conspirators' fraud was wide-reaching.

54.     The current evidence also shows that the Conspirators regularly communicated with one another regarding the details of their fraud.  Because Annex controlled JAC, the Conspirators that were employed within JAC – Smoke, Morrey, and Agafonkin – were able to

18

communicate directly and continually with Coleman, Cheney, and Fowler at Annex for authorization regarding specific fraudulent acts.  Coleman, Cheney, and Fowler exercised persistent, tight control over the fraud through phone calls, e-mail messages, and other informal communications throughout the due diligence process.  Further, Coleman and Fowler discussed the sale process and due diligence and, upon information and belief, their fraudulent scheme with Cheney, Morrey, and Smoke at board meetings on June 2, July 29, September 30, and December 8, 2010.  And continuously throughout the relevant time period Cheney regularly visited Smoke, Morrey, and Agafonkin at JAC's offices in Saline and Pontiac, Michigan, for closed-door discussions regarding the deal.  Annex's majority ownership and control of JAC thereby allowed Coleman, Fowler, and Cheney unfettered access to JAC's management and gave them the power to control every aspect of the fraudulent scheme.

55.     The various frauds the Conspirators perpetrated all followed a persistent pattern. Smoke, Morrey, and Agafonkin would carry out the demands of Annex, Coleman, Cheney, and Fowler by identifying ways to inflate JAC's value through falsifying and omitting material information.  Smoke, Morrey, and Agafonkin would then inform Coleman, Cheney, and Fowler of the potential fraudulent action, and Annex provided explicit or tacit authorization and approval.  Coleman, Cheney, and Fowler would often provide instructions regarding how to execute the fraud in a manner that maximized the fraud's impact in pursuant of their overall goal of inflating JAC's value.

56.     In addition to the overarching elements of the Conspirators' scheme discussed above, the Conspirators used a number of specific false statements and omissions that further advanced their scheme to fraudulently manipulate JAC's financial statements, overstate JAC's value, and deceive the Buyers.  The Conspirators followed this pattern in executing the following components of the fraudulent scheme:

1411476

I.     **Hidden, Manipulated, And Improperly Booked Intercompany Account Balance**

57.     Prior to closing, Cheney, Smoke, Morrey, and Agafonkin concocted a plan to hide close to $2 million in fraudulently inflated earnings related to an improper intercompany account balance.  They pursued this plan with the knowledge of the directors and managers at Annex pursuant to the Conspirators' overarching scheme to defraud the Buyers by presenting false financial information that overstated JAC's value.

58.     This specific component of Conspirators' fraud utilized a pricing discrepancy related to certain rails shipped between JAC subsidiaries in Europe and Georgia.  In 2009 and 2010, JAC had been working on a project for Mercedes known as the "W164" program.  As part of the W164 program, JAC's European subsidiary manufactured rails and shipped them to JAC's subsidiary in Franklin, Georgia for processing.  JAC recorded these shipments as "intercompany" transactions.

59.     In early 2010, JAC's European subsidiary increased the per-rail price it charged to the Franklin subsidiary from €22 to €47.  The Franklin subsidiary, however, did not update its system to reflect this change.  Thus, for each rail made for the W164 program, the European subsidiary recorded an intercompany receivable that was valued based on a transfer price of €47, but the Franklin subsidiary recorded an intercompany payable that was valued on a transfer price of €22.  The resulting balance sheet and income-statement entries caused the European subsidiary to recognize profits that did not exist in reality.

60.     The Franklin subsidiary did not update its system to properly reflect the €47 per-rail transfer price until July 2010.  By this time, the intercompany out-of-balance had grown to $1.9 million, which meant that JAC's earnings were being overstated by the same amount.

61.     The Conspirators decided to use this "mistake" as part of their fraudulent scheme; they knowingly decided to keep these fake earnings on the books and hide them from the Buyers.

1411476

After learning of the pricing error, rather than fix the error as they should have, the Conspirators intentionally kept the fake earnings on the books to inflate JAC's apparent value.

62. But the Conspirators also knew that if the intercompany account balance was too high it might alert the Buyers that JAC's reported earnings were false. So Cheney, Smoke, Morrey, and Agafonkin settled on a plan to use a one-time payment from Mercedes to partially pay down part of the intercompany account balance, in violation of GAAP, and then hide the remaining balance by manipulating various equity accounts.

63. Earlier in 2010 there were indications that Mercedes might give JAC approximately $700,000 as part of a price adjustment for the W164 program.

64. While the Conspirators tried to secure the $700,000 payment from Mercedes, they also tried to hide the intercompany account from the Buyers. For example, on July 3 and 4, 2010, Smoke and Agafonkin, working on behalf of and with the knowledge of the other Conspirators, took out a reference to the intercompany account from a consolidated balance sheet that Agafonkin was preparing as part of the financial model they provided to the Buyers.

65. The Conspirators were finally able to secure the payment from Mercedes in November 2010. On November 10, 2010, Morrey, on behalf of and with the knowledge of the other Conspirators, met with representatives from Mercedes to negotiate the final terms of the payment. At that meeting they negotiated a $750,000 payment from Mercedes to JAC to cover tooling costs relating to the W164 project.

66. According to GAAP, the Conspirators should have recorded that $750,000 payment as income on JAC's P&L. But the Conspirators did not do that. Instead, pursuant to their scheme, they recorded the Mercedes payment as a $750,000 credit to the intercompany account to partially pay down the account to hide the inflated earnings. This left approximately $1.2 million in overstated, fake earnings in the intercompany account.

21

1411476

67.     To hide the remaining $1.2 million in overstated earnings from the Buyers, the Conspirators knowingly and intentionally omitted the $1.2 million intercompany balance on the pre-closing financial statements they gave to the Buyers, burying it in an unspecified equity account, while simultaneously – and falsely – representing that the pre-closing financial statements were complete and accurate.

68.     On December 16, 2010, Smoke e-mailed Cheney and Morrey, expressing his concern there was "still 1.2 million lurking" in the intercompany account, which should be recorded as part of the pre-closing financial statements that the Buyers had asked for.  Cheney asked Smoke what the Conspirators' "plan" should be for hiding the fake earnings.  Smoke suggested that the Conspirators record the remaining intercompany out-of-balance as part of the December 2010 financial statements that the Buyers would not see until after closing.  In Smoke's own words, the Conspirators could "just let it ride until [then] and see if the auditors catch it."  The other Conspirators knowingly agreed with this plan.

69.     Pursuant to this fraudulent scheme, the Conspirators did not correct the entries necessary to address the remaining $1.2 million out-of-balance as part of the pre-closing November financial results they provided to the Buyers before closing.  Thus, the Conspirators fraudulently kept JAC's pre-closing earnings inflated by approximately $1.2 million.  As a result of these fraudulent actions, the Conspirators distorted the value of JAC with the knowledge and intent that the Buyers would rely on the fraudulent misrepresentations and overpay for JAC.

70.     In accordance with instructions from their co-Conspirators and with their full knowledge and consent, Smoke and Morrey also created a plan to fraudulently describe the fake earnings as an innocent mistake once the Buyers learned the truth.  In an e-mail on December 16, 2010, Smoke and Morrey decided that when the Buyers learned of the overstated earnings after closing, they would fraudulently represent that the Conspirators' failure to properly account for

the intercompany out-of-balance was due to their confusion in the "fog of war" leading up to the transaction.  As evident from their communications, however, there was no "fog" – the Conspirators' conduct was blatantly fraudulent.

71.     Although Cheney, Smoke, and Morrey implemented this particular element of the fraud, this was accomplished as part of their fraudulent scheme with Annex, Coleman, and Fowler with the knowledge and approval of those co-Conspirators.

72.     As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the intercompany account balance meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement; there existed material contracts to which JAC and its subsidiaries were parties but which were not

23

specified in Section 2.15(a) through (e) of the Agreement; and JAC and its subsidiaries had not fully complied with certain foreign tax matters specified in Section 2.19(f) of the Agreement.

73.     The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

## II.     Baseless North American To European Chargebacks

74.     JAC's European subsidiary manufactured certain parts in Europe throughout 2010 for the company's North American customer, Daimler US, and shipped them to JAC in the United States.  These parts required some rework before being sent to the customer.  JAC recorded rework expenses taken between July and November 2010 as an ordinary course expense in the U.S.  In November 2010, however, the Conspirators changed this previous accounting practice and decided to charge back the $560,000 rework expense for the entire five-month period to JAC Europe in November.  Europe, however, rejected these chargebacks.  The Conspirators failed to report these expenses as costs, resulting in an overstatement of earnings of $560,000.  The failure effectively concealed actual costs of $560,000 that the company incurred during November and that were not recorded at all.  This level of costs, including the unreported costs, continued into December 2010 with the result that 2010 earnings were more than $1 million less than the numbers presented by the Conspirators.

75.     The Conspirators knew that Europe had already rejected chargebacks and that costs and liabilities were understated by a corresponding amount, but they hid that information from the Buyers during due diligence.  At closing, they continued their fraud by misrepresenting and omitting information in their representations and warranties.  The Conspirators were required to disclose these material facts to JAC and record the appropriate amounts as costs. Instead, they covered up the dispute, taking steps to actively conceal it from the Buyers prior to

24

and during closing.  This was all undertaken to further the Conspirators' joint plan to manufacture earnings in order to deceive the Buyers as to JAC's real value.

76.     Throughout 2010, the Conspirators knew that JAC was incurring rework expenses on the defective parts.  As early as June 2010, employees at JAC reminded Smoke that JAC was incurring these monthly rework expenses and asked whether they should be charged back to Europe.  The Conspirators hid the impact of the rework expenses from the Buyers because Smoke, on behalf of and with the knowledge of the other Conspirators, intended to conceal the fact that Europe had rejected prior attempts to charge similar expenses to Europe.  He instead presented  JAC's financial results to the Buyers with the accumulated balance of these expenses reflected as chargebacks to Europe.  Smoke and the other Conspirators had full knowledge that Europe would reject these expenses and, in fact, had already rejected these expenses.  Therefore, the information provided to the Buyers was knowingly and intentionally false.

77.     Although the Conspirators knew that the chargeback issue should be disclosed to the Buyers, they went so far as to reject their own subsidiary's demand that they do so.  In October 2010, when the Conspirators were debating internally how to manipulate the accounting of the rework expenses, the European subsidiary's CEO told Smoke that the fact that Europe would not pay needed to be disclosed to the Buyers.  The Conspirators knew about the European executive's warning, but intentionally disregarded it.

78.     Instead, the Conspirators changed their accounting practices and booked the rework expenses as chargebacks to the European subsidiary in November.  In total, JAC charged back $112,431 for July 2010, $101,369 for August 2010, $150,369 for September 2010, $114,533 for October 2010, and $79,312 for November 2010.  Shortly thereafter, the European subsidiary's CEO definitively rejected the chargeback expense and refused to pay the amounts charged back.  The European subsidiary's CEO noted "enormous problems" with the

chargebacks and "highly recommended" that the issue be brought up to the Buyers, as it was a material issue.

79.     The Conspirators rejected this admonition and booked the chargebacks as earnings.  They withheld the November 2010 European financials and suppressed JAC Europe's unequivocal rejection of the chargebacks.  This resulted in an overstatement of JAC's earnings. The Conspirators should not have charged these amounts back to Europe in November.

80.     The issue persisted in December 2010, as the expenses masked by the false chargebacks continued to be experienced by the company, and the Conspirators did not inform the Buyers of this fact.  The Conspirators again knowingly failed to properly account for expenses masked by the phony chargebacks and continued to deceive the Buyers as to the true state of JAC's earnings.

81.     As a result of these fraudulent actions, JAC's earnings were overstated and the company's value was inflated.

82.     As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the chargebacks meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries

1411476

were not accurate and complete in all material respects in accordance with good business

practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed

undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of

closing; and JAC and its subsidiaries had not conducted their business only in the ordinary

course consistent with past practices, and there had been material adverse changes to JAC since

December 31, 2009, as specified in Section 2.8(a) of the Agreement.

83.     The Buyers, reasonably relying on the fraudulent representations and statements

from the Conspirators, were not able to learn the truth until after closing and, consequently,

overpaid for JAC.

### III.     Manipulated Tooling Receivables From KIA

84.     Unbeknown to the Buyers, the Conspirators negotiated an agreement with one of

JAC's customers, KIA, to allow it to recharacterize certain tooling charges on a long-term

program based on a piece-price reimbursement to be a single, lump-sum payment.  In exchange

for the lump-sum payment, the Conspirators agreed that JAC would forego future tooling

charges on the program.  The original agreement had specified JAC would be reimbursed over

the course of the life of the vehicle via a change in the piece-price.

85.     With the knowledge of all the Conspirators, Morrey, Smoke, and Agafonkin

booked the lump-sum payment as income but did not write down the value of the tooling asset

for the foregone future charges and previously billed amounts.  They should have reserved or

written down against the full value of the tooling balances in accordance with GAAP, and they

should have reserved a liability for the previously-charged amounts.  In short, the KIA agreement

resulted in $241,000 in costs that would not be recovered, leading to a loss that had not been

accrued for or disclosed to the Buyers.  Furthermore, JAC had recognized $233,000 of income

via the piece-price, on product already sold to KIA which JAC was now obligated to return or

1411476

credit to KIA.  The deal required JAC to reimburse that amount.  But the Conspirators did not write-down the income they had to return.  Thus, the Conspirators' actions allowed them to conceal $241,000 in 2010 costs and overstate 2010 revenues by $233,000, which, in total, overstated earnings by at least $474,000.  Again, the Conspirators were aware that these earnings overstatements would lead to an artificially inflated calculation of JAC's value in the transaction with the Buyers and knowingly engaged in these misstatements for precisely that purpose.

86.    The Conspirators hid the deal with KIA and prevented the Buyers from discovering the facts and circumstances until after the transaction closed.  Both Morrey and Smoke knew about the deal with KIA and orchestrated it with the knowledge of and on behalf of the other Conspirators.  In October 2010, Smoke informed a JAC employee that the Conspirators would generate earnings in November 2010 by pulling in money from KIA.  The Conspirators were looking for ways to falsely inflate JAC's earnings even at the expense of its long-term health.  Later, Morrey instructed Smoke and others at JAC, on behalf of and with the knowledge of the other Conspirators, to strike a tooling deal with KIA in November 2010.  As part of these instructions, Morrey expressed his intent to generate earnings as a result of the KIA deal.  Neither Morrey, Smoke, or any other member of the Conspiracy disclosed the agreement to the Buyers.

87.    JAC did account for the lump-sum payment from KIA, but in the process the Conspirators refused to reserve against the amounts of the foregone previously-billed charges and the future tooling amounts the company expected to realize.  The timing of Morrey's November 2010 instruction to strike a deal with KIA corresponded with Cheney's instruction to withhold the October 2010 financials from the Buyers until the other manipulations were finished.  On information and belief, Morrey and Smoke reported the KIA situation to Coleman,

Fowler, and Cheney and manipulated the accounting of the deal at their instruction.  The KIA manipulation was one aspect of the Conspirators' broader fraud scheme.

88.     The accounting consequences of the KIA agreement were not disclosed to the Buyers until after closing.  When, post-closing, Morrey was confronted with the Conspirators' accounting for the deal, he claimed that he did not realize that Smoke was manipulating the numbers.  Morrey's explanation flatly contradicted the contemporaneous e-mails demonstrating that the Conspirators knew about the move and communicated about how to handle it.

89.     As a result of these fraudulent actions, JAC's earnings were overstated and the company's value was inflated.

90.     As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the KIA agreement meant that there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement; that the accounts and notes receivable of JAC had not arisen from bona fide transactions in the ordinary course consistent with past practice and payable on ordinary terms, as required by Section 2.24(a) of the Agreement; and that the accounts or notes receivable of JAC were subject to setoff, contrary to the terms of Section 2.24(b) of the Agreement.

1411476

91.     The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

**IV.     Fraudulently Manipulated And Misstated Inventory Data**

92.     As part of the Conspirators' scheme to falsely inflate JAC's earnings and value, they fraudulently manipulated and misstated inventory data in four different ways.

93.     ***First***, the Conspirators fraudulently inflated earnings by intentionally overstating the value of the physical inventory at JAC's Saline, Michigan facilities by $2,709,000.

94.     The Conspirators were well aware of problems with JAC's pre-closing inventory counts.  As early as March 3, 2010, a JAC employee e-mailed Smoke and noted problematic differences between the Saline facility's physical inventory counts and JAC's perpetual ledger. The physical inventory counts had been showing a net "shrink" of inventory value versus what JAC had on its ledger.  This led to JAC understating its costs of goods sold and thereby overstating its earnings.  Annex and the other Conspirators also knew of these problems.  For example, on August 5, 2010, Cheney e-mailed Smoke and asked him for an update on how much JAC's inventory was "inflated."

95.     Despite these known problems with JAC's inventory, Morrey and Smoke, with the knowledge and consent of the other Conspirators, decided to cancel standard inventory counts at JAC in order to conceal the inventory issues and the corresponding overstated earnings. For example, a physical inventory count at JAC's Saline facility was cancelled in June 2010.

96.     But even though the Conspirators were cancelling inventory counts at JAC, they repeatedly represented to the Buyers during due diligence that JAC was performing a reliable cycle count of inventory every month and a full physical count of inventory twice a year at its facilities and then recording the results on JAC's financial statements.  This was knowingly

30

false; JAC had not been conducting and recording these counts as represented and the March count had revealed profound issues with the inventory reflected in JAC's books and records.

97.     In addition, the Conspirators knew that the Buyers wanted an accurate physical inventory count prior to closing.  Indeed, the Buyers made sure that a full physical inventory would be taken prior to closing as part of their due diligence.  And in early December 2010, the Buyers added a schedule to the draft Agreement that required a full description for how physical inventory would be taken at Saline immediately prior to closing.  This schedule was circulated and discussed among Annex, Coleman, Cheney, and Smoke on December 3, 2010.  All of the Conspirators knew that because of JAC's prior issues with physical inventory counts showing understated costs and overstated earnings, the pre-closing inventory could alert the Buyers to the Conspirators' scheme to inflate earnings through overstated inventory.

98.     To hide their scheme, the Conspirators decided to simply hide the numbers.  The pre-closing physical inventory was performed at JAC's facilities, including Saline, on Saturday, December 18 and Sunday, December 19, 2010.  Smoke had the final numbers and variance reports from that count by that Sunday afternoon, and upon information and belief, he shared those with the other Conspirators.  The variance reports and other adjustments showed that JAC's inventory at Saline was over $2.7 million less than what was reflected in the perpetual inventory records shown to the Buyers during due diligence.  But the Conspirators did not disclose these variances to the Buyers.  Instead, Smoke, acting on behalf and under the direction of the other Conspirators, intentionally halted JAC's standard investigation into the variances and did not record the numbers from that count into the final inventory numbers used for closing.

99.     On Monday, December 20, 2010, prior to closing, the Buyers asked the Conspirators for the final inventory count, variance reports, and book-to-physical adjustments from the pre-closing physical count at Saline.  The Conspirators gave the Buyers a "Certificate of

Closing Expenses" that indicated the overall inventory value substantially matched what the Conspirators had previously represented to the Buyers. In connection with that closing certificate, Smoke, with the full knowledge and support of Fowler and Cheney, also sent the Buyers – prior to closing – a spreadsheet that listed inventory values that had been slightly but insignificantly changed from values previously provided to the Buyers, further indicating that the Conspirators had recorded the physical counts from over the weekend and updated the financials accordingly. This was false. Yet the Conspirators knew that the Buyers would rely on this data and reasonably assume that the pre-closing physical count had been booked and incorporated into the financial results. The Buyers' reliance was reasonable in part because the Conspirators represented prior to closing – and then warranted in the Agreement – that JAC's records, including those regarding inventory, were accurate and in compliance with GAAP.

100.    Shortly after closing, the Buyers gained access to the final results of the inventory counts from the pre-closing physical inventory at Saline. The Buyers were shocked at the enormous difference between the actual physical count and the figure that had been disclosed in connection with closing. Defendant Morrey, attempting to conceal the active fraud that had taken place, suggested that the count must have been inaccurate and ordered a new physical count for December 27 and 28, 2010. That second physical count, however, confirmed that the pre-closing count was correct, and that the Conspirators had intentionally concealed the final numbers from that count as part of their plan to overstate JAC's earnings and falsely inflate its purchase price.

101.    **Second**, similar to what the Conspirators had done at Saline, they intentionally overstated the physical inventory at JAC's Franklin, Georgia facility by $390,067 by hiding negative physical inventory counts to falsely inflate JAC's earnings.

102.     The Conspirators intentionally did not record multiple physical inventory counts at Franklin in 2010.  There was an interim physical inventory performed at Franklin in August or September 2010.  That physical inventory showed that Franklin had approximately $390,000 less in inventory than what the Conspirators had recorded in the financial records they supplied to the Buyers.  Upon information and belief, the Conspirators did not record the physical inventory numbers from that interim count in an intentional effort to fraudulently conceal approximately $390,000 in overstated earnings.

103.     The Conspirators, working through Cheney, Smoke, and others, also intentionally concealed the impact of results of the final pre-closing physical inventory at Franklin by falsely indicating the physical-count adjustments had been incorporated into the financial results the Conspirators provided.  The Conspirators knew that the Buyers would rely on those financial results and reasonably assume that the pre-closing physical count had been booked accordingly.  The result of the fraud was similar to the fraud as to the Saline numbers – the Conspirators lowered JAC's apparent costs of goods sold, overstated JAC's apparent earnings, and fraudulently induced the Buyers to overpay.

104.     *Third*, the Conspirators intentionally overstated the total value of JAC's inventory by over $2 million, thereby inflating 2010 earnings by $867,000, by improperly excluding large components of inventory, including, without limitation, all service parts and work in process, from the calculation of JAC's "Excess and Obsolete" inventory reserves.  They did this pursuant to their overarching plan to overstate JAC earnings and falsely inflate JAC's apparent value.

105.     JAC had been improperly excluding, without limitation, the above categories of inventory from the calculation of JAC's Excess and Obsolete inventory reserves since at least 2009.  Smoke, acting pursuant to the Conspirators' plan to inflate earnings and with the other Conspirators' knowledge, decided to continue improperly excluding the above inventory

33

categories from the calculation of JAC's Excess and Obsolete inventory reserves throughout the Buyers' due diligence in 2010.

106.    Pursuant to the Conspirators' plan and direction, Smoke intentionally withheld information from the Buyers that would have shown this problem.  For example, on December 18, 2010, Smoke expressly directed a lower-level employee via an e-mail message not to give the Buyers or their due-diligence consultants the obsolete inventory listing for JAC's Franklin facility until after closing.  By intentionally failing to properly establish – and thereby understate – Excess and Obsolete inventory reserves, JAC's financial position was overstated by approximately $2,155,000 at closing.  Of that amount, $867,000 related to the period from January 2010 through the closing, which caused earnings for 2010 to be overstated by a corresponding amount and falsely inflated the apparent value of JAC.

107.    Due to this particular fraud in the Conspirators' overall scheme to inflate JAC's earnings, the Buyers did not discover the true value of JAC's inventory and earnings until weeks after closing, and, consequently, they overpaid for JAC.

108.    *Fourth*, as yet another part of their plan to falsely inflate JAC's apparent value, the Conspirators fraudulently manipulated certain of JAC's other inventory reserves.

109.    JAC's standard practice was to carry negative and positive variances between its general ledger and its perpetual inventory balances until year end, and then book the net impact of those variances at year end to reconcile the accounts.

110.    In August and September 2010 – and in the face of representations that they had not changed and would not change their accounting practices – the Conspirators knowingly and intentionally modified that practice.  In the Conspirators' terms, they started to relieve the "good guys" from the balance sheet as income on a monthly basis, while keeping the negative reserves – or "bad guys" – on the balance sheet.  Each of the Conspirators was aware of this plan, which

34

was implemented by Smoke.  By initiating this element of the fraudulent scheme, Conspirators were able to falsely inflate earnings by almost $1,000,000 and grossly overstate JAC's value.

111.    The Conspirators knew that the Buyers were relying on their representations and financial statements as to the value of JAC's inventory.  The Conspirators knowingly and intentionally concealed from the Buyers that only the beneficial variances had been relieved and recorded, so that the Buyers would overpay for JAC, which they did.

112.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up each of the four fraudulent schemes related to inventory.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to inventory meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement; and the inventories, net of reserves, were not in good and marketable condition and usable and of a

35

quantity and quality saleable in the ordinary course, as specified in Section 2.25 of the Agreement.

113.     The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

### V.     Fraudulently Concealed Customer Giveback

114.     During 2010, JAC made two adjustments involving receivables for one of its major customers, Chrysler.  Instead of disclosing these adjustments as required, the Conspirators decided to conceal them to further their scheme to defraud the Buyers.  On information and belief, the Conspirators communicated regarding the giveback and intentionally decided to conceal the transaction.

115.     In August 2010, Chrysler reduced its accounts receivable payment to JAC by approximately $127,000 due to air-freight charges it incurred the previous year.  JAC and Chrysler had disputed whether Chrysler owed the charged freight amounts.  As a result of resolving this dispute, JAC received $127,000 less than it had booked as accounts receivable. The Conspirators failed to reserve against this amount, as they were required to do, and conspired to hide the facts and circumstances surrounding the resolution of this dispute from the Buyers.  Instead, the Conspirators maintained the full balance of the Chrysler receivable on the book and misled the Buyers into believing that this was an actively disputed amount that they expected to recover.

116.     Two months later, JAC also negotiated a 2% retroactive price giveback with Chrysler on certain programs related to sales in 2010.  The Conspirators refused to record the giveback as a liability on the closing Financial Statements, resulting in an overstatement of revenues in 2010 in the amount of $275,000 and a corresponding overstatement of earnings.

36

1411476

117.    These agreements with Chrysler were discussed among the Conspirators, and they chose to conceal them to inflate earnings. Employees at JAC warned Morrey and Smoke that the proper accounting for the Chrysler freight charge reduction would negatively impact JAC's earnings. Smoke, on behalf of and with the knowledge of the other Conspirators, disregarded the employees' explicit statements that the Chrysler items should be properly accounted for before closing and opted to disregard the required write-down and the need to book the accrual. Had the Conspirators disclosed the agreements and the negative impacts to earnings, the Buyers could have altered their valuation accordingly. Instead, the Conspirators concealed the agreements to hide JAC's true performance.

118.    Although the agreements were settled with Chrysler by November 2010, the Conspirators continued to suggest that the amount of the air freight charges was disputed, that recovery was likely, and the full balance of the Chrysler receivable would also be recovered. This was false. Smoke's statements were part of the Conspirators' overall scheme to defraud the Buyers. On information and belief, Smoke and Morrey communicated with Annex, Coleman, Fowler, and Cheney regarding the Chrysler adjustments and followed their instructions to conceal the situation to further the fraud. The company already had agreed to both the giveback and the freight adjustment, which should have resulted in a hit to earnings of at least $400,000.

119.    As a result of these fraudulent actions, JAC's earnings were overstated and the company's value was improperly and fraudulently inflated.

120.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme. The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and

37

overpay for JAC.  The specific frauds related to the giveback meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement; there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement; that the accounts and notes receivable of JAC had not arisen from bona fide transactions in the ordinary course consistent with past practice and payable on ordinary terms, as specified by Section 2.24(a) of the Agreement; and that the accounts or notes receivable of JAC were subject to setoff, contrary to the terms of Section 2.24(b) of the Agreement.

121.    The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

### VI.    Hidden Status Of Key Equipment

122.    The Conspirators never disclosed that a key piece of equipment, the W164 tool on the Hydroform Press, was cracked and not fit to carry out the business for which it was intended.

1411476

More than simply being worn or somewhat damaged, the tool instead was massively damaged and was not able to produce parts anywhere near the quality level for which it was designed and required by JAC's customers.  Thus, the tool was unfit for its stated purpose.  The Conspirators never disclosed the true condition of the tool at any time.

123.    The Conspirators knew about the state of the press and tool no later than September 2010, when Smoke received e-mails from JAC's European subsidiary, which he passed along to others at JAC, regarding the defective state of the tool.  As per the Conspirators' usual practice, Smoke and Morrey informed other members of the conspiracy and took action on behalf of the other Conspirators.  In a November 10, 2010 letter to a JAC customer, Morrey, on behalf of and with the knowledge of the other Conspirators, recognized the state of the tool and confirmed that significant rework would need to be done during December.  The issue involving the tool was so severe that JAC and the customer involved negotiated a price adjustment over the issue.  The timing of Morrey's letter coincided with Annex, Coleman, Fowler, and Cheney's decision to delay releasing the October 2010 financial statements until they had been manipulated.  The decision to hide the status of the tool was part of this overall scheme to defraud.  On information and belief, Morrey sought authorization from Annex, Coleman, Fowler, and Cheney regarding the decision to conceal the equipment's status.

124.    Unbeknown to the Buyers, the limited repairs done pursuant to the agreement with the customer were wholly inadequate to ensure that the tool could operate at the appropriate level.  Moreover, the negotiated adjustment (that was used to partially cover the out-of-balance Intercompany Account, as described above) was inadequate to cover the needed repairs and expedited production on a going-forward basis.

125.    The Conspirators were aware that the defective condition of this press was a significant issue.  It was the only piece of equipment suitable to manufacture a component part

1411476

for a customer contract that represented a significant driver of JAC's earnings.  The Conspirators

knew that JAC was unable to manufacture this component on the press without significant

rework and addition expense.  Yet, the Conspirators hid from the Buyers the defective condition

of the press and the inevitable impact of the defective press on expenses and earnings.  The

Conspirators did so in order to further their fraudulent scheme to artificially inflate JAC's value

and corresponding purchase price.

126.     Post-closing, the Buyers have incurred significant expenses to rework defective

parts and ship them on an expedited basis directly and solely as a result of the defective tool,

causing a significant loss.  These losses were known and quantifiable to the Conspirators at the

time of closing, but they never disclosed the extent of the damage to the tool to the Buyers.  The

Buyers were forced to post an accrual of $5,376,818 on the December 31, 2010 balance sheet to

account for the losses associated with the program related to the tool in question.

127.     As a result of these fraudulent actions, JAC's earnings were overstated and the

company's value was inflated.

128.     As described above, certain of the Conspirators – including Annex and Coleman

(individually and on behalf of Trust) – also made representations and warranties in the

Agreement to further cover up their fraudulent scheme.  The Conspirators knew these

representations and warranties were false from the start based on their intentionally fraudulent

acts, but they made them anyway to further induce the Buyers to enter into the transaction and

overpay for JAC.  The specific frauds related to the Hydroform Press meant that the equipment

of JAC was not in good operating condition and repair and was not suitable for its purpose, as

specified in Section 2.13 of the Agreement; the financial statements the Conspirators provided to

the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout

the periods involved, nor did they fairly present, in all material respects, the consolidated

40

financial position of JAC and its subsidiaries at the time of closing and the consolidated results

of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the

Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and

complete in all material respects in accordance with good business practice and all applicable

laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the

type specified in Section 2.7(c) of the Agreement at the time of closing; JAC and its subsidiaries

had not conducted their business only in the ordinary course consistent with past practices, and

there had been material adverse changes to JAC since December 31, 2009, as specified in

Section 2.8(a) of the Agreement; there existed material contracts to which JAC and its

subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the

Agreement; and that the inventories of JAC, net of reserves, were not in good and marketable

condition, and were not usable and of a quantity and quality saleable in the ordinary course, as

specified in Section 2.25 of the Agreement.

129.    The Buyers, reasonably relying on the fraudulent representations and statements

from the Conspirators, were not able to learn the truth until after closing and, consequently,

overpaid for JAC.

**VII.    Fraudulently "Stretched" Accounts Payable In Germany**

130.    Prior to closing, as part of the Conspirators' plan to further inflate JAC's purchase

price and induce the Buyers to enter the Agreement and overpay for the company, the

Conspirators came up with a plan to create the illusion of additional cash and lower debt at JAC

by "stretching" accounts payable.  Specifically, on July 30, 2010, Cheney e-mailed Smoke and

told him that Annex – specifically Coleman and Fowler – had expressly asked that Cheney and

Smoke "come back to them with a plan" that included "stretching payables," which would inflate

cash flow.  In response to this request, Cheney and Smoke came up with a plan to fraudulent

41

delay – i.e., "stretch" – payments to vendors and suppliers at JAC's German operations.  The rest of the Conspirators knowingly participated in this scheme.

131.    During due diligence, the Conspirators represented to the Buyers that JAC's German operations paid its vendors and suppliers within set windows of time.  Pursuant to the Conspirators' scheme, they instructed employees in Germany to delay €3.3 million of payments to vendors and suppliers, well in excess of the standard payment windows.  This effectively represented a concealed borrowing of €3.3 million and significantly inflated the cash position and the true debt position on the balance sheet for JAC's German operations, which made JAC's German operations look financially healthier than they were.

132.    Although JAC was delaying payments to vendors and suppliers in Germany, the Conspirators represented to the Buyers that JAC's German operations were continuing to meet the standard payment windows.  The Conspirators knew that this representation was false, and they intended for the Buyers to rely on that false representation, which they did.

133.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the stretched payables meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its

subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement; that the accounts and notes receivable of JAC had not arisen from bona fide transactions in the ordinary course consistent with past practice and payable on ordinary terms, as specified by Section 2.24(a) of the Agreement; and that the accounts or notes receivable of JAC were subject to setoff, contrary to the terms of Section 2.24(b) of the Agreement.

134.    The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.  And the Buyers were further damaged because the accounts payable that the Conspirators had "stretched" had to be repaid after closing, in the first quarter of 2011.  Thus, the Buyers had to pay €3.3 million of payables that they believed, based on the Conspirators' express representations, that JAC could continue to hold outstanding in the ordinary course of business.

**VIII.   Undisclosed Mazda Tooling Shortfall**

135.    Prior to closing, JAC submitted a final bid on project for Mazda known as the J53C project.  At the time of the bid, the Conspirators were aware that JAC would incur a loss of between $264,000 and $504,000 to cover tooling costs associated with the project when JAC was awarded the contract.

136.    The Conspirators knew that the Buyers were relying on the Conspirators' representations and financial statements regarding JAC's projects and potential tooling costs,

1411476

including those related to the J53C project.  The Conspirators, however, knowingly and intentionally failed to reserve at JAC for the potential J53C tooling costs, as required by GAAP, or in any other way disclose to the Buyers that the submitted bid included significant losses relating to tooling in order to conceal the potential loss and further inflate JAC's earnings and apparent value, pursuant to their fraudulent scheme.

137.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the undisclosed Mazda tooling shortfall meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; JAC's tangible assets were not as specified in Section 2.13 of the Agreement; and the accounts and notes receivable and payable were not properly accounted for as specified in Section 2.24 of the Agreement.

1411476

138.    The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

### IX.    Customer Warranty Charge

139.    A customer notified JAC in late 2010 of a warranty claim of $150,000 relating to four side rail parts.  The Conspirators, however, failed to establish or maintain any reserve during 2010 to cover such claims as required under GAAP.  They intentionally misrepresented the nature of this charge during the conspiracy, alleging that the charge was disputed when there was no basis to contest the warranty claim.  As a result of these fraudulent actions, JAC's earnings were overstated and the company's value was inflated.  This amount should have been disclosed and would have directly reduced JAC's earnings.  The warranty claim came amidst the Conspirators' decision in the fall of 2010 to delay releasing the October 2010 financial statements in order to manipulate the financials.  The decision to mischaracterize the warranty charge and misrepresent its nature was made jointly by the members of the conspiracy to further their scheme, including Annex, Coleman, Fowler, Cheney, Morrey, and Smoke.

140.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the warranty charge meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of

closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; and there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

141.    The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

## X.    Medical Reserve

142.    During 2010, the Conspirators understated JAC's reserves for its self-insured group medical insurance.  Based on JAC's medical expense experience, GAAP required the reserve for group insurance to be approximately $252,000 higher than reported in the financial statements at closing.  As a result of these actions, JAC's actual costs were understated by this incrementally required reserve amount and JAC's earnings were inflated by the amount of this incrementally required amount.  This amount should have been disclosed and would have directly reduced JAC's earnings.  Based on the current analysis by the Buyers, this resulted in an understatement of the actual 2010 costs incurred by JAC of at least $252,000.  The Conspirators' refusal to reserve for group insurance was intentional.  It was part of the Conspirators' overall scheme to defraud the Buyers and inflate JAC's value.  On information and belief, Smoke and Morrey intentionally refused to account for the reserve on the instructions of Annex, Coleman, Fowler, and Cheney.

143.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the

46

Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the warranty charge meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; and there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

144.    The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

**XI.    Saline Press**

145.    JAC operates a 3000 lb. press to manufacture product in its Saline, Michigan facility.  Prior to closing, the Conspirators were aware that the press was severely defective but failed to disclose these defects.  Following closing, the press has broken down repeatedly, requiring the Buyers to invest considerable sums to repair the press.  In addition, the Buyers have incurred significant overtime costs to compensate for downtime when the press has been inoperable.

146.    The Conspirators elected not to disclose the defective condition of the press to

47

the Buyers, as recognition of the additional expense resulting from this issue would have decreased JAC's earnings and, correspondingly, the value of the company.  As part of their fraudulent scheme, the Conspirators chose to misrepresent the condition of the press to artificially inflate JAC's value and increase their undeserved profit from the sale.  On information and belief, Smoke and Morrey intentionally concealed the status of the press on the instructions of Annex, Coleman, Fowler, and Cheney.

147.    Currently, the increased expenses resulting from the defective press are approximately $125,000.  The Buyers expect, however, to incur significant additional losses going forward as a result of the defective condition of the press.

148.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the Saline Press meant the equipment of JAC was not in good operating condition and repair and was not suitable for its purpose, as specified in Section 2.13 of the Agreement.

149.    The Buyers, reasonably relying on the fraudulent representations and statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

## XII.    Unauthorized Relocation Of Customer Work

150.    JAC's contract with a major customer requires advance approval by the customer of any change in manufacturing location.  The Conspirators were fully aware of this requirement and had evaluated whether to request the customer's approval to undertake such a move.

48

Nevertheless, knowing that the customer was unlikely to allow the move without undertaking an extensive review of the new facility and despite the clear contractual requirement, the Conspirators moved assembly work for this customer without the customer's approval. The Conspirators did this the weekend immediately preceding the sale of JAC closing on December 20, 2010, and without disclosing it to the Buyers. The company moved the assembly work related to critical components of the customer that were being produced and assembled in the Franklin, Georgia facility to the nearby LaGrange, Georgia warehouse, without first obtaining the required authorizations from the customer.

151.    After closing, the Buyers first learned of the unauthorized move and notified the customer of the need for a meeting to discuss the move of the assembly work to the LaGrange facility. Upon learning of this, the customer issued a "Red" rating to the Franklin facility, effectively putting the company on a new-business hold at the Franklin facility and requiring JAC to respond to and correct the issues caused by the unauthorized move. The process of attempting to remove the new-business hold and responding to the audit of all of the company's facilities was disruptive, time-consuming, and required significant manpower and resources.

152.    At the time of this violation, the potential impact to the Company was catastrophic. Loss of this customer would have threatened the viability of the Company. Therefore, the Conspirators elected to conceal this material information from the Buyers in order to ensure the transaction closed and their profit was secured. The Conspirators' concealment was part of the Conspirators' overall scheme to defraud the Buyers and inflate JAC's value. On information and belief, Smoke and Morrey moved the assembly work with the knowledge of and at the instructions of Annex, Coleman, Fowler, and Cheney.

153.    The Buyers, reasonably relying on the fraudulent representations and statements from Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

154.    The Buyers, through significant mitigation efforts, have been able to salvage this customer and minimize the impact of the breach and subsequent concealment.  However, significant costs were incurred to mitigate the impact of this component of the Conspirators' fraudulent scheme.

155.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the relocation of customer work and the damages incurred as a result meant the financial statements the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in

50

Section 2.8(a) of the Agreement; and JAC was in violation of or in default under its contract with the customer contrary to representations made in Section 2.15(e) of the Agreement.

156.    If the Buyers had been informed, as required, of the intentional breach of this contract, the Buyers would have either refused to close or significantly reduced the amount of the purchase price for JAC to account for the actual costs that would be incurred to address the breach and the significant risk associated with the potential loss of future significant business.

### XIII.   Settlement Of Sales Tax Audit

157.    The Conspirators intentionally failed to disclose the settlement of a sales tax audit by the State of Michigan prior to closing.  From 2006 to 2010, JAC had been the subject of a state sales tax audit over amounts it owed the State of Michigan.  Unbeknown to the Buyers, the Conspirators settled this dispute and agreed to pay the State of Michigan $180,000 prior to closing.  The Conspirators should have disclosed the settlement and recognized the amount as a liability when the settlement was reached.  The Conspirators did not disclose this material information to the Buyers and did not book any liability for this amount and, as result, overstated JAC's earning as part of their overall scheme to deceive the Buyers into overpaying.  The Conspirators' concealment of the settlement and refusal to book the amount was intentional.  On information and belief, Smoke and Morrey intentionally concealed the settlement on the instructions of Annex, Coleman, Fowler, and Cheney.

158.    As described above, certain of the Conspirators – including Annex and Coleman (individually and on behalf of Trust) – also made representations and warranties in the Agreement to further cover up their fraudulent scheme.  The Conspirators knew these representations and warranties were false from the start based on their intentionally fraudulent acts, but they made them anyway to further induce the Buyers to enter into the transaction and overpay for JAC.  The specific frauds related to the sales tax audit meant the financial statements

1411476

the Conspirators provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement; the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement; there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing; there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement; that the accounts and notes receivable of JAC had not arisen from bona fide transactions in the ordinary course consistent with past practice and payable on ordinary terms, as specified by Section 2.24(a) of the Agreement; and that the accounts or notes receivable of JAC were subject to setoff, contrary to the terms of Section 2.24(b) of the Agreement.

159.    The Buyers, relying on the representations and financial statements from the Conspirators, were not able to learn the truth until after closing and, consequently, overpaid for JAC.

### XIV.    Intentionally Concealed Material Adverse Changes At JAC

160.    As discussed previously at paragraphs 18-50, the Conspirators fraudulently manipulated JAC's financial statements and concealed profound issues relating to the operation of the company's business.

161.    Each of the elements of the Conspirators' fraudulent scheme was designed to conceal the fact that the company it was selling bore no resemblance to the company that was

portrayed in the financial statements, document and other representations made as part of the sale process.

162.     The Conspirators each knew that the business was a shambles and was in materially worse condition than the representations each Conspirator was making and sponsoring as part of the sale process.

163.     Despite this knowledge, Conspirators failed to disclose, and affirmatively represented to the Buyers as part of the closing that JAC had *not* undergone, a material adverse change.  (*See* Agreement § 2.8(a).)

## CUMULATIVE EFFECT OF THE CONSPIRATORS'
## FRAUDULENT CONSPIRACY AND BREACHES OF THE AGREEMENT

164.     As part of their due diligence, the Buyers reasonably relied on the Conspirators' representations regarding JAC's financial performance and operations.  The Buyers repeatedly asked the Conspirators to provide them with complete, accurate information regarding JAC's operations and financial performance, including accurate financial statements.

165.     The Buyers' reasonable reliance on the Conspirators' representations was based in large part on the Conspirators' duties under both applicable law and the Agreement to convey accurate and sufficiently complete information to the Buyers during due diligence, and to fully and truthfully answer the Buyers' questions.

166.     Notwithstanding these duties and the Buyers' requests, the Conspirators repeatedly provided representations – including documents, data, and financial statements regarding JAC – that were divorced from reality, as part of their plan to inflate JAC's apparent value and induce the Buyers to enter into the agreement and overpay for JAC.  The Conspirators knew that the Buyers would reasonably rely on these false representations, and they knowingly and intentionally exploited the Buyers' reliance to trick the Buyers into overpaying.

167.    JAC's actual value at the time of closing was approximately $50 million less than what the Conspirators had represented and what they had induced the Buyers to pay.  Had the Conspirators fully disclosed JAC's true financial condition and complied with their obligations pursuant to applicable law, GAAP, and the Agreement, the Buyers would have not entered into the Agreement or would have paid far less.

**COUNT ONE**

**Violation of Rule 10b-5 of the Securities Exchange Act of 1934,
15 U.S.C. § 78a et seq. and 17 C.F.R. § 240.10b-5**

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

168.    The Buyers incorporate and re-allege the preceding paragraphs as if fully set forth herein.

169.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made a series of material misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii) Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer,

54

Chrysler; (vii) Defendants hid the condition of a key piece of equipment, the W164 tool for the Hydroform Press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within historical and acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

170.   Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions, at a minimum, recklessly, but which evidence shows were made intentionally.

171.   Defendants used directly and indirectly the mail and instrumentalities of interstate commerce – including phones calls and e-mails – to accomplish their material misrepresentations and omissions and defraud the Buyers.

172.   These material misrepresentations and omissions were made in connection with the sale of securities in the form of the Agreement and Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin had a duty to disclose the information to the Buyers.

173.   The Buyers relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

174.   The Buyers suffered economic loss due to Defendants' actions.

55

175.     The Buyers' loss was caused by their reasonable reliance on Defendants' material misrepresentations.  Had Defendants not misrepresented JAC's financial statements, the Buyers would have not entered into the transaction or paid far less for the company.

**WHEREFORE**, the Buyers pray for the following relief:

A.     the Court declare that Defendants engaged in material misrepresentations and omissions in relation to the sale of securities described in the Agreement;

B.     the Court award the Buyers damages for Defendants' violations of the securities law;

C.     the Court award the Buyers their costs herein; and

D.     the Court award such further relief as may be appropriate.

**COUNT TWO**

**Secondary Violation of Rule 10b-5 of the Securities Exchange Act of 1934,
15 U.S.C. § 78a et seq. and 17 C.F.R. § 240.10b-5**

**(Against Defendants Dewan and Coleman Trust, and in the alternative to Count One
against Defendants Annex, Coleman, Fowler, and Cheney)**

176.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

177.     Defendants Morrey, Smoke, and Agafonkin made a series of material misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated. Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii)

Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants hid the condition of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

178.    Defendants Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions, at a minimum, recklessly, but which evidence shows were made intentionally.

179.    Defendants used directly and indirectly the mail and instrumentalities of interstate commerce – including phones calls and e-mails – to accomplish their material misrepresentations and omissions and defraud the Buyers.

1411476

180.    These material misrepresentations and omissions were made in connection with the sale of securities in the form of the Agreement, and Defendants Morrey, Smoke, and Agafonkin had a duty to disclose the information to the Buyers.

181.    The Buyers reasonably relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

182.    The Buyers suffered economic loss due to Defendants' actions.

183.    The Buyers' loss was caused by their reliance on Defendants' material misrepresentations and omissions.  Had Defendants not misrepresented JAC's financial statements, the Buyers would have not entered into the transaction or paid far less for the company.

184.    Defendants Dewan, Annex, Coleman, Coleman Trust, Fowler, and Cheney directly and indirectly controlled Defendants Morrey, Smoke, and Agafonkin through the ownership of voting securities and by contract.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants Dewan, Annex, Coleman, Coleman Trust, Fowler, and Cheney controlled Defendants who engaged in material misrepresentations and omissions in relation to the sale of securities described in the Agreement;

B.    the Court award the Buyers damages for Defendants' violations of the securities law;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

1411476

## COUNT THREE

### Violation of Delaware Securities Act, Del. Code Ann. Tit. 6, § 73-101 et seq.

### (Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)

185.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

186.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made a series of misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii) Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants hid the condition of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements

disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

187.    The representations and omissions made by Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin were representations and omissions of material fact.

188.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions, at a minimum, recklessly, but which evidence shows were made intentionally.

189.    These material misrepresentations and omissions were made in connection with the sale of securities in the form of the Agreement and Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin had a duty to disclose the information to the Buyers.

190.    The Buyers reasonably relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

191.    The Buyers suffered economic loss due to Defendants' actions.

192.    The Buyers' loss was caused by their reliance on Defendants' material misrepresentations and omissions.  Had Defendants not misrepresented JAC's financial statements, the Buyers would have not entered into the transaction or paid far less for the company.

**WHEREFORE**, the Buyers pray for the following relief:

A.      the Court declare that Defendants engaged in material misrepresentations and omissions in relation to the sale of securities described in the Agreement;

B.      the Court award the Buyers damages for Defendants' violations of the securities law;

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

## COUNT FOUR

**Secondary Violation of Delaware Securities Act, Del. Code Ann. Tit. 6, § 73-101 et seq.**

**(Against Defendants Dewan and Coleman Trust, and in the alternative to Count Three against Defendants Annex, Coleman, Fowler, and Cheney)**

193.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

194.    Defendants Morrey, Smoke, and Agafonkin made a series of material misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated. Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii) Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants hid the

condition of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

195.    The representations and omissions made by Defendants Morrey, Smoke, and Agafonkin were representations and omissions of material fact.

196.    Defendants Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions, at a minimum, recklessly, but which evidence shows were made intentionally.

197.    These material misrepresentations and omissions were made in connection with the sale of securities in the form of the Agreement and Defendants Morrey, Smoke, and Agafonkin had a duty to disclose the information to the Buyers.

198.    The Buyers reasonably relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

199.    The Buyers suffered economic loss due to Defendants' actions.

200.    The Buyers' loss was caused by their reliance on Defendants' material misrepresentations and omissions.  Had Defendants not misrepresented JAC's financial

62

statements, the Buyers would have not entered into the transaction or paid far less for the company.

201.   Defendants Dewan, Annex, Coleman, Coleman Trust, Fowler, and Cheney directly and indirectly controlled Defendants Morrey, Smoke, and Agafonkin through the ownership of voting securities and by contract.

**WHEREFORE**, the Buyers pray for the following relief:

A.   the Court declare that Defendants Dewan, Annex, Coleman, Coleman Trust, Fowler, and Cheney controlled Defendants who engaged in material misrepresentations and omissions in relation to the sale of securities described in the Agreement;

B.   the Court award the Buyers damages for Defendants' violations of the securities law;

C.   the Court award the Buyers their costs herein; and

D.   the Court award such further relief as may be appropriate.

## COUNT FIVE

**Violation of Michigan Uniform Securities Act of 2002, MCLA 451.2101 et seq.**

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

202.   The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

203.   Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made a series of material misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions

1411476

made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii) Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants hid the condition of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

204.     Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions with knowledge that they were false or made them, at a minimum, recklessly, but which evidence shows were made intentionally.

1411476

205.    These material misrepresentations and omissions were made in connection with the sale of securities in the form of the Agreement.

206.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions with the intention that they should be acted upon by the Buyers.

207.    The Buyers reasonably relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

208.    The Buyers suffered economic loss due to Defendants' actions.

209.    The Buyers' loss was caused by their reliance on Defendants' material misrepresentations and omissions.  Had Defendants not misrepresented JAC's financial statements, the Buyers would have not entered into the transaction or paid far less for the company.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants engaged in material misrepresentations and omissions in relation to the sale of securities described in the Agreement;

B.    the Court award the Buyers damages for Defendants' violations of the securities law;

C.    the Court award the Buyers its costs herein; and

D.    the Court award such further relief as may be appropriate.

1411476

## COUNT SIX

**Secondary Violation of Michigan Uniform Securities Act of 2002, MCLA 451.2101 et seq.**

**(Against Defendants Dewan and Coleman Trust, and in the alternative to Count Five against Defendants Annex, Coleman, Fowler, and Cheney)**

210.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

211.     Defendants Morrey, Smoke, and Agafonkin made a series of material misrepresentations and omissions regarding JAC's operations and financial conditions between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated. Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and withheld the November 2010 financial statements of JAC's European subsidiary under false pretenses; (ii) Defendants concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants hid the condition of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a

1411476

customer warranty claim and misrepresented the nature of the charge; (xi) Defendants omitted material reserve amounts from its financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

212.    Defendants Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions with knowledge that they were false or made them, at a minimum, recklessly, but which evidence shows were made intentionally.

213.    These material misrepresentations and omissions were made in connection with the sale of securities in the form of the Agreement.

214.    Defendants Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions with the intention that they should be acted upon by the Buyers.

215.    The Buyers reasonably relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

216.    The Buyers suffered economic loss due to Defendants' actions.

217.    The Buyers' loss was caused by their reliance on Defendants' material misrepresentations and omissions.  Had Defendants not misrepresented JAC's financial statements, the Buyers would have not entered into the transaction or paid far less for the company.

218.    Defendants Dewan, Annex, Coleman, Coleman Trust, Fowler, and Cheney directly and indirectly controlled Defendants Morrey, Smoke, and Agafonkin through the ownership of voting securities and by contract.

1411476

219.    Defendants Dewan, Annex, Coleman, Fowler, and Cheney were also advisors to JAC and aided Defendants Morrey, Smoke, and Agafonkin's material misrepresentations.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants Dewan, Annex, Coleman, Coleman Trust, Fowler, and Cheney controlled Defendants who engaged in material misrepresentations and omissions in relation to the sale of securities described in the Agreement;

B.    the Court award the Buyers damages for Defendants' violations of the securities law;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

## COUNT SEVEN

### Fraudulent Inducement

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

220.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

221.    Defendants Annex, Atrium, Coleman, Fowler, Cheney, Morrey, Smoke, Agafonkin, made a series of pre-contractual, factual representations regarding JAC's financial statements between July 2010 and December 2010 that were false.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in October and November 2010 and provided false pretenses for withholding the November 2010 financial statements of JAC's European subsidiary; (ii) Defendants provided financial statements

1411476

to the Buyers that concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and affirmatively misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants misstated the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

222.    Defendants made these material misrepresentations and omissions with knowledge that they were false or as a positive assertion without any knowledge of their truth.

223.    Defendants made these material misrepresentations and omissions with the intention that they induce the Buyers to enter into the Agreement and purchase JAC.

224.     The Buyers acted in reasonable reliance on these material misrepresentations and omissions in entering into the Agreement and purchasing JAC.  But for these materials misrepresentations and omissions, the Buyers would not have entered into the Agreement.

225.     The Buyers suffered injury as a result of Defendants' actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.       the Court declare that Defendants engaged in material misrepresentations and omissions to fraudulent induce the Buyers to enter into the Agreement;

B.       the Court award the Buyers damages for Defendants' violations;

C.       the Court award the Buyers their costs herein; and

D.       the Court award such further relief as may be appropriate.

## COUNT EIGHT

### Fraudulent Misrepresentation

**(In the alternative to Fraudulent Inducement, against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

226.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

227.     Defendants made certain representations and warranties in the Agreement, including representations regarding the accuracy of JAC's financial statements (§ 2.7); the absence of certain changes or events (§ 2.8); the condition of JAC's tangible assets (§ 2.13); the disclosure of agreements (§ 2.15); compliance with and disclosure of tax obligations (§ 2.19); the accuracy, disclosure, and propriety of accounts and notes receivable and payable (§ 2.24); and the value, quantity, and quality of inventory (§ 2.25).

228.     Defendants Annex, Atrium, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made a series of false material representations regarding JAC's financial statements between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to

70

hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and provided false pretenses for withholding the November 2010 financial statements of JAC's European subsidiary; (ii) Defendants provided financial statements to the Buyers that concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and affirmatively misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants misstated the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

229.   Defendants made these material misrepresentations and omissions with knowledge that they were false or as a positive assertion without any knowledge of their truth.

230.   These materials misrepresentations and omissions made the representations and warranties in the Agreement false and fraudulent, and Defendants knew that at the time of closing.

231.   Defendants made these false and fraudulent representations and warranties in the Agreement with the intention that the Buyers rely and act upon them.

232.   The Buyers acted in reasonable reliance on false and fraudulent representations and warranties in the Agreement.

233.   The Buyers suffered injury as a result of Defendants' actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.   the Court declare that Defendants made false and fraudulent representations and warranties in the Agreement;

B.   the Court award the Buyers damages for Defendants' violations;

C.   the Court award the Buyers their costs herein; and

D.   the Court award such further relief as may be appropriate.

## COUNT NINE

### Conspiracy to Commit Fraudulent Inducement or Fraudulent Misrepresentation

### (Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)

234.   The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

235.   Defendants constitute a combination of two or more people.

236.   Defendants agreed to or had a preconceived plan to make fraudulent misrepresentations and omissions regarding JAC's financial statements.

72

237.    At least one or more members of the conspiracy made a series of false material representations regarding JAC's financial statements between July 2010 and December 2010. As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and provided false pretenses for withholding the November 2010 financial statements of JAC's European subsidiary; (ii) Defendants provided financial statements to the Buyers that concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and affirmatively misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants misstated the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work

73

without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

238.     Defendants made these material misrepresentations and omissions with knowledge that they were false or as a positive assertion without any knowledge of their truth.

239.     Defendants made these material misrepresentations and omissions with the intention that the Buyers rely and act upon them.

240.     The Buyers acted in reasonable reliance on these material misrepresentations and omissions in establishing the purchase price for JAC and entering into the Agreement.

241.     The Buyers suffered injury as a result of the conspiracy's actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.     the Court declare that Defendants conspired to engage in material misrepresentations and omissions in relation to the sale JAC;

B.     the Court award the Buyers damages for Defendants' violations;

C.     the Court award the Buyers their costs herein; and

D.     the Court award such further relief as may be appropriate.

## COUNT TEN

**Concert of Action as to Fraudulent Inducement or Fraudulent Misrepresentation**

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

242.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

243.     Defendants had a tacit understanding between and among one another to act tortiously in a common design to fraudulently misrepresent JAC's financial statements.

244.     At least one or more Defendants made a series of false material representations regarding JAC's financial statements between July 2010 and December 2010.  As alleged above,

Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and provided false pretenses for withholding the November 2010 financial statements of JAC's European subsidiary; (ii) Defendants provided financial statements to the Buyers that concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and affirmatively misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants misstated the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

1411476

245.     Defendants made these material misrepresentations and omissions with knowledge that they were false or as a positive assertion without any knowledge of their truth.

246.     Defendants made these material misrepresentations and omissions with the intention that the Buyers rely and act upon them.

247.     The Buyers acted in reasonable reliance on these material misrepresentations and omissions in establishing the purchase price for JAC and entering into the Agreement.

248.     The Buyers suffered injury as a proximate result of Defendants' common design.

249.     The Defendants are joint and severally liable for the Buyers' injury.

**WHEREFORE**, the Buyers pray for the following relief:

A.       the Court declare that Defendants had a tacit understanding to engage in material misrepresentations and omissions in relation to the sale JAC;

B.       the Court award the Buyers damages for Defendants' violations;

C.       the Court award the Buyers its costs herein; and

D.       the Court award such further relief as may be appropriate.

**COUNT ELEVEN**

**Silent Fraud**

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

250.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

251.     Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin omitted material information and suppressed truthful information regarding JAC's financial statements between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material omissions and suppression of truth made as part of

76

this scheme include: (i) Defendants withheld the November 2010 financial statements of JAC's European subsidiary and provided incomplete financial data regarding JAC'; (ii) Defendants provided financial statements to the Buyers that omitted the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary while failing to disclose the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA while providing financial statements to the Buyers that omitted critical reserves; (v) Defendants omitted the true amounts JAC's inventory; (vi) Defendants represented financial statements that omitted giveback and write-off amounts to its customer, Chrysler; (vii) Defendants omitted critical information regarding the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants misrepresented to the Buyers that payments were made within acceptable time periods while omitting the fact that Defendants had instructed JAC's European subsidiary to stretch payables; (ix) Defendants failed to reserve against tooling costs for a bid project in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim while misrepresenting the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

252.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin omitted material information with knowledge that the given information was false or as a positive assertion without any knowledge of their truth.

253.     Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin omitted material information with the intention that the Buyers rely and act upon the information they did provide.

254.     Because the Buyers inquired about the information provided by the Defendants, Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin had a duty to provide the Buyers with all material information relevant to the inquiries.

255.     Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin violated this duty.

256.     The Buyers acted in reasonable reliance on these material omissions in establishing the purchase price for JAC.

257.     The Buyers suffered injury as a result of Defendants' actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.     the Court declare that Defendants engaged in silent fraud in relation to the sale JAC;

B.     the Court award the Buyers damages for Defendants' violations;

C.     the Court award the Buyers their costs herein; and

D.     the Court award such further relief as may be appropriate.

**COUNT TWELVE**

**Conspiracy to Commit Silent Fraud**

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

258.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

259.     Defendants constitute a combination of two or more people.

78

260.    Defendants agreed to or had a preconceived plan to omit material information and suppress the truth regarding JAC's financial statements.

261.    At least one or more members of the conspiracy omitted material information and suppressed truthful information regarding JAC's financial statements between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material omission and suppression of truth made as part of this scheme include: (i) Defendants withheld the November 2010 financial statements of JAC's European subsidiary and provided incomplete financial data regarding JAC'; (ii) Defendants provided financial statements to the Buyers that omitted the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary while failing to disclose the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA while providing financial statements to the Buyers that omitted critical reserves; (v) Defendants omitted the true amounts JAC's inventory; (vi) Defendants represented financial statements that omitted giveback and write-off amounts to its customer, Chrysler; (vii) Defendants omitted critical information regarding the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants misrepresented to the Buyers that payments were made within acceptable time periods while omitting the fact that Defendants had instructed JAC's European subsidiary to stretch payables; (ix) Defendants failed to reserve against tooling costs for a bid project in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim while misrepresenting the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its

79

representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

262.    The Defendants omitted material information with knowledge that the information was false.

263.    The Defendants omitted material information with the intention that the Buyers rely and act upon them.

264.    Because the Buyers inquired about the information provided by the Defendants, the Defendants had a duty to provide the Buyers with all material information relevant to the inquiries.

265.    The Defendants violated this duty.

266.    The Buyers acted in reasonable reliance on these material omissions in establishing the purchase price for JAC.

267.    The Buyers suffered injury as a result of Defendants' actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants engaged in a conspiracy to commit silent fraud in relation to the sale JAC;

B.    the Court award the Buyers damages for Defendants' violations;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

1411476

## COUNT THIRTEEN

### Concert of Action as to Silent Fraud

**(Against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

268.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

269.    Defendants constitute a combination of two or more people.

270.    Defendants had a tacit understanding between and among one another to act tortiously in a common design to omit material information relevant to JAC's financial statements.

271.    At least one of Defendants omitted material information and suppressed truthful information regarding JAC's financial statements between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material omissions and suppression of truth made as part of this scheme include: (i) Defendants withheld the November 2010 financial statements of JAC's European subsidiary and provided incomplete financial data regarding JAC'; (ii) Defendants provided financial statements to the Buyers that omitted the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary while failing to disclose the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA while providing financial statements to the Buyers that omitted critical reserves; (v) Defendants omitted the true amounts JAC's inventory; (vi) Defendants represented financial statements that omitted giveback and write-off amounts to its customer, Chrysler; (vii) Defendants omitted critical information regarding the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants misrepresented to the Buyers that payments were made

81

within acceptable time periods while omitting the fact that Defendants had instructed JAC's European subsidiary to stretch payables; (ix) Defendants failed to reserve against tooling costs for a bid project in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim while misrepresenting the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

272.    The Defendants omitted material information with knowledge that the information was false.

273.    The Defendants omitted material information with the intention that the Buyers rely and act upon the information given.

274.    Because the Buyers inquired about the information provided by the Defendants, the Defendants had a duty to provide the Buyers with all material information relevant to the inquiries.

275.    The Defendants violated this duty.

276.    The Buyers acted in reasonable reliance on these material omissions in establishing the purchase price for JAC.

277.    The Buyers suffered injury as a result of Defendants' actions.

278.    The Defendants are joint and severally liable for the Buyers' injury.

**WHEREFORE**, the Buyers pray for the following relief:

A.      the Court declare that Defendants engaged in a concert of action to commit silent fraud in relation to the sale JAC;

B.      the Court award the Buyers damages for Defendants' violations;

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

### COUNT FOURTEEN

### Negligent Misrepresentation

### (In the alternative, against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)

279.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

280.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made a series of false material representations regarding JAC's financial statements between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated. Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and provided false pretenses for withholding the November 2010 financial statements of JAC's European subsidiary; (ii) Defendants provided financial statements to the Buyers that concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and affirmatively misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for

giveback and write-off amounts to its customer, Chrysler; (vii) Defendants misstated the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

281.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin owed the Buyers a duty of care.

282.    Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin made these material misrepresentations and omissions without reasonable care.

283.    The material misrepresentations and omissions were false.

284.    The Buyers justifiably and detrimentally relied on these material misrepresentations and omissions in establishing the purchase price for JAC.

285.    The Buyers suffered injury as a result of Defendants' actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants engaged in negligent misrepresentation in relation to the sale JAC;

B.    the Court award the Buyers damages for Defendants' violations;

1411476

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

## COUNT FIFTEEN

### Innocent Misrepresentation

**(In the alternative, against Defendants Annex, Coleman, Fowler, Cheney, Morrey, Smoke, and Agafonkin)**

286.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

287.    Defendants made a series of false material representations regarding JAC's financial statements between July 2010 and December 2010.  As alleged above, Defendants engaged in a scheme to hide from the Buyers the fact that JAC's financial condition had materially and significantly deteriorated.  Specific material misrepresentations and omissions made as part of this scheme include: (i) Defendants misrepresented the financial results of JAC in November 2010 and provided false pretenses for withholding the November 2010 financial statements of JAC's European subsidiary; (ii) Defendants provided financial statements to the Buyers that concealed the Intercompany Account imbalance; (iii) Defendants recorded certain chargeback amounts to JAC's European subsidiary and concealed the fact that the subsidiary rejected the chargebacks; (iv) Defendants concealed the circumstances of its tooling deal with KIA and affirmatively misrepresented financial statements that failed to reserve against foregone tooling charges; (v) Defendants misrepresented JAC's inventory amounts in 2010 and misrepresented the counts that took place; (vi) Defendants misrepresented financial statements that failed to account for giveback and write-off amounts to its customer, Chrysler; (vii) Defendants misstated the status of a key piece of equipment, the W164 tool for the Hydroform press; (viii) Defendants stretched payables in Europe and misrepresented to the Buyers that payments were made within acceptable time periods; (ix) Defendants misrepresented tooling

costs associated with the bid on a customer project and failed to reserve against them in statements provided to the Buyers; (x) Defendants omitted reserves from financial statements disclosed to the Buyers related to a customer warranty claim and misrepresented the nature of the charge; (xi) Defendants misrepresented the appropriate reserve amounts from JAC's financial statements related to JAC's self-insured medical coverage; (xii) Defendants concealed the condition of its Saline press in its representations to Buyers; (xiii) Defendants concealed the fact that JAC relocated customer work without the customer's authorization causing JAC to incur significant costs as a result of the move; and (xiv) Defendants concealed the settlement over its state sales tax audit.

288.    The Defendants made these material misrepresentations and omissions in connection with the making of a contract with the Buyers that placed the parties in privity.

289.    The Buyers acted in reasonable reliance on these material misrepresentations and omissions in establishing the purchase price for JAC.

290.    The Buyers suffered injury as a result of Defendants' actions.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants engaged in innocent misrepresentations and omissions in relation to the sale of JAC;

B.    the Court award the Buyers damages for Defendants' violations;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

1411476

## COUNT SIXTEEN

### Breach of the Agreement as to the Intercompany Account Balance

### (In the alternative, against all Defendants)

291.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

292.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

293.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

294.    As described in paragraphs 57 through 73, Defendants intentionally and fraudulently represented financial statements as being in accordance with GAAP knowing they had materially misstated the financial statements due, in part, to the intercompany out-of-balance position.  During the first half of 2010, the out-of-balance position grew to approximately $1.9 million, resulting in intercompany receivables and intercompany payables not eliminating properly and revenues and earnings being overstated by the same $1.9 million.  Defendants intentionally and fraudulently did not correct this out-of-balance position or disclose it to the Buyers.

295.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

1411476

296.   Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

297.   Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

298.   Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

299.   Defendants' actions breached Section 2.15 of the Agreement because there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement.

300.   Defendants' actions breached Sections 2.19(f) of the Agreement because JAC and its subsidiaries had not fully complied with certain foreign tax matters specified in Section 2.19(f) of the Agreement.

301.   As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.   the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.   the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

## COUNT SEVENTEEN

### Breach of the Agreement as to North American to European Chargebacks

### (In the alternative, against all Defendants)

302.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

303.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

304.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

305.    As described in paragraphs 74 through 83, Defendants intentionally and fraudulently failed to disclose unrecognized chargebacks from JAC's North American operations to its European operations, which contributed to both a further out-of-balance of the intercompany receivables and payables and an overstatement of November 2010 earnings on a consolidated basis.

306.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

307.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material

respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

308.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

309.    Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

310.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

**COUNT EIGHTEEN**

**Breach of the Agreement as to KIA Tooling Charges**

**(In the alternative, against All Defendants)**

311.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

312.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

313.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

314.    As described in paragraphs 84 through 91, Defendants intentionally and fraudulently failed to disclose and properly account for an agreement with KIA that recharacterized and waived certain tooling charges in exchange for a lump-sum payment.  The KIA tooling had originally cost JAC approximately $2.1 million.  The original contract with KIA specified that JAC would be reimbursed over the course of the life of a vehicle via a charge in the piece-price.  JAC entered into a new agreement with KIA for a lump-sum payment that provided JAC $241,000 less than the original cost for the tooling, resulting in a loss that Defendants improperly failed to accrue for or disclose to the Buyers.  Furthermore, by the time the new agreement was reached, JAC had recognized $233,000 of income via the piece-price adjustment on product already sold to KIA.  The new agreement also required JAC to refund that $233,000, but that refund was similarly not accrued for at the time of the transaction or disclosed to the Buyers.  As a result, earnings were materially overstated in the financial statements Defendants provided to the Buyers.

315.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

316.    Defendants' actions breached Section 2.15 of the Agreement because there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement.

317.    Defendants' actions breached Section 2.24 of the Agreement because the accounts and notes receivable and payable were not properly accounted for as specified in Section 2.24 of the Agreement.

318.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

**COUNT NINETEEN**

**Breach of the Agreement as to Physical Inventory**

**(In the alternative, against all Defendants)**

319.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

320.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

321.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

322.    As described in paragraphs 92 through 113, Defendants intentionally and fraudulently inflated earnings during 2010 by overstating physical inventory at JAC's facilities in Saline, Michigan, and Franklin, Georgia, and they intentionally and fraudulently failed to

92

disclose the true final physical inventory count results and resulting financial impacts for each facility.  Defendants misled the Buyers into believing the inventory had been properly stated and counted through a program of monthly cycle counting and biannual full physical inventories. Known differences between the periodic physical counts, including the pre-closing physical inventory, and the inventory perpetual ledger were not recorded, resulting in a continued overstatement of inventory.  Defendants intentionally and fraudulently withheld this overstatement from the Buyers through closing.

323.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

324.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

325.     Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

326.    Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

1411476

327.     Defendants' actions breached Section 2.25 of the Agreement because the inventories, net of reserves, were not in good and marketable condition and usable and of a quantity and quality saleable in the ordinary course, as specified in Section 2.25 of the Agreement.

328.     As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.     the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.     the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.     the Court award the Buyers their costs herein; and

D.     the Court award such further relief as may be appropriate.

**COUNT TWENTY**

**Breach of the Agreement as to Excess and Obsolete Inventory**

**(In the alternative, against all Defendants)**

329.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

330.     The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

331.     The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

332.     As described in paragraphs 92 through 113, Defendants intentionally and fraudulently excluded certain inventory from the Excess and Obsolete category.  By intentionally

94

excluding certain inventory from the calculation of Excess and Obsolete reserves, Defendants knowingly overstated the fair value of JAC's inventory by over $2 million and inflated 2010 earnings by $867,000.  In determining the Excess and Obsolete reserves, Defendants intentionally and fraudulently excluded, among other things, service parts and work-in-progress inventory.  Defendants intentionally and fraudulently withheld the Excess and Obsolete reserve calculation and supporting details from the Buyers.

333.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

334.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

335.     Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

336.     Defendants' actions breached Section 2.25 of the Agreement because the inventories, net of reserves, were not in good and marketable condition and usable and of a quantity and quality saleable in the ordinary course, as specified in Section 2.25 of the Agreement.

337.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

## COUNT TWENTY-ONE

### Breach of the Agreement as to Manipulated Inventory Reserves

### (In the alternative, against all Defendants)

338.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

339.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

340.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

341.    As described in paragraphs 92 through 113, Defendants intentionally and fraudulently manipulated inventory variances and reserves to inflate earnings during the months of August and September 2010, so that JAC's apparent operating results would match earnings represented to the Buyers.  The manipulated variances and reserves masked JAC's true financial performance.  The manipulation of these variances and reserves was inconsistent with JAC's past

practice, including its practice in the first seven months of 2010, and was intentionally and fraudulently not disclosed to the Buyers.

342.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

343.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

344.     Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

345.    Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

346.    Defendants' actions breached Section 2.25 of the Agreement because the inventories, net of reserves, were not in good and marketable condition and usable and of a quantity and quality saleable in the ordinary course, as specified in Section 2.25 of the Agreement.

1411476

347.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

## COUNT TWENTY-TWO

### Breach of the Agreement Due to Customer Givebacks

### (In the alternative, against all Defendants)

348.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

349.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

350.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

351.    As described in paragraphs 114 through 121, Defendants intentionally and fraudulently failed to disclose and properly account for agreements with Chrysler regarding air freight charges and a retroactive price giveback.  Defendants intentionally and fraudulently failed to record a reduction in accounts receivable, and corresponding reduction in earnings, of $127,000 from Chrysler in August 2010 related to freight charges.  Defendants also intentionally and fraudulently failed to properly accrue for retroactive price reductions to Chrysler of 2% in

November 2010.  Defendants intentionally and fraudulently failed to disclose these agreements to the Buyers.

352.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

353.    Defendants' actions breached Section 2.15 of the Agreement because there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement.

354.    Defendants' actions breached Section 2.24 of the Agreement because the accounts and notes receivable and payable were not properly accounted for as specified in Section 2.24 of the Agreement.

355.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.      the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.      the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

1411476

## COUNT TWENTY-THREE

### Breach of the Agreement as to the W164 Tool on the Hydroform Press

### (In the alternative, against all Defendants)

356.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

357.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

358.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

359.    As described in paragraphs 122 through 129, Defendants intentionally and fraudulently failed to account for and disclose the physical condition of a key piece of equipment, the tool for the W164 program on the Hydroform Press in Germany.  Defendants intentionally and fraudulently failed to inform the Buyers that the tool was massively damaged and producing parts with less than acceptable levels of quality.  Defendants' intentional and fraudulent failure to inform the Buyers of the condition of the tool resulted in significant, unplanned expenditures, overstated earnings, and a need to renegotiate a price adjustment with Mercedes.

360.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

361.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

362.     Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

363.    Defendants' actions breached Section 2.13 of the Agreement because JAC's tangible assets were not as specified in Section 2.13 of the Agreement.

364.    Defendants' actions breached Section 2.15 of the Agreement because there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement.

365.    Defendants' actions breached Section 2.25 of the Agreement because the inventories, net of reserves, were not in good and marketable condition and usable and of a quantity and quality saleable in the ordinary course, as specified in Section 2.25 of the Agreement.

366.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

## COUNT TWENTY-FOUR

**Breach of the Agreement as to "Stretched" Accounts Payable in Germany**

**(In the alternative, against all Defendants)**

367.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

368.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

369.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

370.    As described in paragraphs 130 through 134, Defendants intentionally and fraudulently delayed payment to vendors of JAC's German operations in an effort to preserve and enhance cash in Germany, a practice that was not in the ordinary course.  In total, JAC's German operations delayed €3.3 million in payables beyond the ordinary course terms with its vendors.  Defendants intentionally and fraudulently failed to disclose these delayed payables to the Buyers.

371.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

372.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material

102

1411476

respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

373.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

374.    Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

375.    Defendants' actions breached Section 2.24 of the Agreement because the accounts and notes receivable and payable were not properly accounted for as specified in Section 2.24 of the Agreement.

376.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.      the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.      the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

1411476

## COUNT TWENTY-FIVE

### Breach of the Agreement as to Mazda Tooling

### (In the alternative, against all Defendants)

377.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

378.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

379.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

380.    As described in paragraphs 135 through 138, Defendants were in the process of quoting on the Mazda J53C program during the Buyers' due diligence.  In the process of quoting the Mazda J53C program, JAC submitted a final bid knowing it would incur a loss of between $264,000 and $504,000 to cover tooling costs related to the program if it won the contract.  The magnitude of this loss would have a material impact on JAC's earnings.  Defendants intentionally and fraudulently failed to inform the Buyers of this potential loss.

381.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

382.     Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all

material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

383.     Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

384.     Defendants' actions breached Section 2.13 of the Agreement because JAC's tangible assets were not as specified in Section 2.13 of the Agreement.

385.     Defendants' actions breached Section 2.24 of the Agreement because the accounts and notes receivable and payable were not properly accounted for as specified in Section 2.24 of the Agreement.

386.     As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.     the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.     the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.     the Court award the Buyers their costs herein; and

D.     the Court award such further relief as may be appropriate.

## COUNT TWENTY-SIX

### Breach of the Agreement as to Material Adverse Changes

### (In the alternative, against all Defendants)

387.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

1411476

388.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

389.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

390.    As described above, Defendants intentionally and fraudulently concealed material adverse changes in JAC, including such concealment through manipulating and omitting data and financial statements regarding the performance of JAC's European operations in November 2010.  Defendants intentionally and fraudulently withheld this critical information recognizing fully that if the complete results of JAC's European operations in November 2010 were disclosed to the Buyers, the Buyers would have demanded a purchase-price reduction or walked away from the deal entirely.

391.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

392.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

393.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

106

394.    Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

395.    Defendants' actions breached Section 2.25 of the Agreement because the inventories, net of reserves, were not in good and marketable condition and usable and of a quantity and quality saleable in the ordinary course, as specified in Section 2.25 of the Agreement.

396.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

## COUNT TWENTY-SEVEN

### Breach of the Agreement as to Customer Warranty Charge

### (In the alternative, against all Defendants)

397.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

398.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

1411476

399.     The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

400.     As described in paragraphs 139 through 141, Defendants intentionally and fraudulently failed to establish and maintain a reserve for a customer warranty claim in 2010 related to side rails, despite the claim being asserted prior to closing of the transaction.  By intentionally and fraudulently failing to appropriately reserve for the claim, earnings were overstated by $150,000.  Furthermore, Defendants intentionally and fraudulently failed to notify the Buyers of the claim.

401.     Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

402.     Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

403.     Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

404.     As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

1411476

**WHEREFORE**, the Buyers pray for the following relief:

A.      the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.      the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

## COUNT TWENTY-EIGHT

### Breach of the Agreement as to the Medical Reserve

### (In the alternative, against all Defendants)

405.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

406.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

407.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

408.    As described in paragraphs 142 through 144, Defendants intentionally and fraudulently understated reserves for JAC's self-insured group medical insurance.  The understated reserves were the direct result of JAC not properly accruing at month-end to reflect the appropriate medical reserve balances, while allowing medical costs (as bills came in) to be offset against the reserve without any earnings impact.  Had the medical accruals been established appropriately at each month end, as required and as Defendants had intentionally and fraudulently represented, earnings would have been negatively impacted.

409.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with

GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

410.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

411.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

412.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

1411476

## COUNT TWENTY-NINE

### Breach of the Agreement as to the Saline Press

### (In the alternative, against all Defendants)

413.    The Buyers incorporate and re-allege the paragraphs 1 through 167 as if fully set forth herein.

414.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

415.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

416.    As described in Paragraphs 145 through 149, Defendants intentionally and fraudulently failed to disclose known defects in Press 15 at JAC's Saline, Michigan facility.

417.    Defendants' actions breached Section 2.13 of the Agreement because JAC's tangible assets were not as specified in Section 2.13 of the Agreement.

418.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.    the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.    the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.    the Court award the Buyers their costs herein; and

D.    the Court award such further relief as may be appropriate.

1411476

## COUNT THIRTY

### Breach of the Agreement as to Relocation of Customer Work

### (In the alternative, against all Defendants)

419.     The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

420.     The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

421.     The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

422.     As described in paragraphs 150 through 156, Defendants moved the assembly work related to GMT 900 series components from JAC's Franklin, Georgia facility to JAC's LaGrange, Georgia warehouse without first obtaining GM's approval, in violation of JAC's contracts with GM.  Defendants intentionally and fraudulently failed to notify or disclose the change to the Buyers.

423.     Defendants' actions breached Section 2.7(c) because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

424.     Defendants' actions breached Section 2.8(a) of the Agreement because JAC and its subsidiaries had not conducted their business only in the ordinary course consistent with past practices, and there had been material adverse changes to JAC since December 31, 2009, as specified in Section 2.8(a) of the Agreement.

425.     Defendants' actions breached Section 2.15 of the Agreement because there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement.

1411476

426.    As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.      the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.      the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.      the Court award the Buyers their costs herein; and

D.      the Court award such further relief as may be appropriate.

## COUNT THIRTY ONE

### Breach of the Agreement as to Undisclosed Settlement of Sales Tax Audit

### (In the alternative, against all Defendants)

427.    The Buyers incorporate and re-allege paragraphs 1 through 167 as if fully set forth herein.

428.    The Agreement is a valid and enforceable contract, consisting of an offer, acceptance, consideration, and definite and certain terms.

429.    The Buyers have fully performed every obligation they owe to Defendants under the Agreement.

430.    As described in paragraphs 157 through 159, Defendants intentionally and fraudulently failed to disclose and properly record a settlement regarding a sales tax audit from the State of Michigan.  During 2010, the State of Michigan was conducting a sales tax audit on JAC relating to sales taxes paid for the period of 2006 to 2010.  Despite the on-going sales tax audit, Defendants intentionally and fraudulently did not established a reserve of any kind at JAC relating to the audit and potential assessments, as required by GAAP.  Furthermore, Defendants

113

agreed to pay $180,000 to settle the dispute but intentionally and fraudulently did not accrue for or disclose that settlement payment to the Buyers.  The proper accrual for the settlement would have increased liabilities by $180,000 and reduced earnings by $180,000, at a time when Defendants realized any negative impacts to earnings could potentially derail the transaction.

431.    Defendants' actions breached Section 2.7(a) of the Agreement because the financial statements Defendants provided to the Buyers were not prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, nor did they fairly present, in all material respects, the consolidated financial position of JAC and its subsidiaries at the time of closing and the consolidated results of their operations and cash flows for the periods indicated, as specified in Section 2.7(a) of the Agreement.

432.    Defendants' actions breached Section 2.7(b) of the Agreement because the books, records, and accounts of JAC and its subsidiaries were not accurate and complete in all material respects in accordance with good business practice and all applicable laws as specified in Section 2.7(b) of the Agreement.

433.    Defendants' actions breached Section 2.7(c) of the Agreement because there existed undisclosed liabilities of the type specified in Section 2.7(c) of the Agreement at the time of closing.

434.    Defendants' actions breached Section 2.15 of the Agreement because there existed material contracts to which JAC and its subsidiaries were parties but which were not specified in Section 2.15(a) through (e) of the Agreement.

435.    Defendants' actions breached Sections 2.24 of the Agreement because the accounts and notes receivable and payable were not properly accounted for as specified in Section 2.24 of the Agreement.

1411476

436.     As a result of Defendants' breaches, the Buyers have suffered losses to be proven at trial, including but not limited to, benefit-of-the-bargain damages for overpaying for JAC.  In addition, Enterprises is entitled to indemnification under Section 7 of the Agreement.

**WHEREFORE**, the Buyers pray for the following relief:

A.     the Court declare that Defendants have breached the Agreement and the Buyers are entitled to damages;

B.     the Court award the Buyers damages for Defendants' breaches of the Agreement;

C.     the Court award the Buyers their costs herein; and

D.     the Court award such further relief as may be appropriate.

**JURY DEMAND**

Wynnchurch demands a jury trial on all issues properly tried.

DATED:  December 12, 2012               Respectfully submitted,

                                        GRIPPO & ELDEN LLC


                                        By:  s/ Michael P. Conway
                                            _____
                                            Michael P. Conway
                                            GRIPPO & ELDEN LLC
                                            111 South Wacker Drive
                                            Chicago, Illinois 60606
                                            (312) 704-7700
                                            mconway@grippoelden.com
                                            Ill. State Bar No. 6201032

                                            David M. Saperstein, P49764
                                            Karen Libertiny Ludden, P48815
                                            MADDIN HAUSER WARTELL ROTH &
                                            HELLER PC
                                            28400 Northwestern Highway, Third Floor
                                            Southfield, Michigan 48034
                                            (248) 354-4030
                                            dsaperstein@maddinhauser.com
                                            kludden@maddinhauser.com

                                            *Attorneys for JAC Holding Enterprises, Inc.,
                                            Wynnchurch Capital, Ltd., and Wynnchurch
                                            Capital Partners II, L.P.*

1411476